James G.P. COLLINS, Plaintiff,

v.

ASSOCIATED PATHOLOGISTS, LTD., William M. Nickey, Jr., Donald D. Van Fossan, Victor H. Lary, Alfonso J. Strano, St. John's Hospital Sisters of the Third Order of St. Francis, Defendants.

No. 84–1332.

United States District Court, C.D. Illinois, Peoria Division.

Feb. 11, 1987.

Carol Fines, Giffin, Winnin, Linder, New-kirk, Cohen & Bodewes, Springfield, Ill., Mark Crane, Hopkins & Sutter, Chicago, Ill., for plaintiff.

Robert Gillespie, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Springfield, Ill., for Pathologists.

Hugh Graham III, Graham & Graham, Springfield, Ill., for St. John's Hosp.

**1392**

## ORDER

MIHM, District Judge.

The Plaintiff filed this antitrust lawsuit, claiming that he was prevented from practicing pathology at the hospital where he had worked for eight years, because his membership in the group providing such services to the hospital had been terminated. The Plaintiff, Dr. James G.P. Collins, contends that the contractual arrangement between the Defendant Hospital, St. John's Hospital, and the Defendant pathological group, Associated Pathologists, Ltd., is an exclusive dealing arrangement and an illegal tying agreement in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and the Illinois Antitrust Act Ill.Rev. Stat., ch. 38, § 60–1 to § 60–11 (1983). The Plaintiff also argues that his dismissal from Associated Pathologists and the Hospital's subsequent refusal to hire him resulted in claims for breach of contract, unlawful withdrawal of staff privileges, and misrepresentation. After substantial discovery and voluminous filings by the parties, this case is before the Court upon the Defendants' Motions for Summary Judgment.

## STATEMENT OF FACTS

Associated Pathologists, Ltd., (APL) is an Illinois medical corporation whose principal employees are the individual Defendants, Doctors Donald Van Fossan, William M. Nickey, Jr., Victor H. Lary, and Alfonso J. Strano. Dr. J. Herschel Fulcher, Jr. was a member of the APL until his death in March of 1983, and Dr. Collins has named Jessie Fulcher, as executor of Dr. Fulcher's estate, a Defendant in this suit. St. John's Hospital of the Hospital Sisters of the Third Order of St. Francis (St. John's) is an Illinois not-for-profit corporation which owns and operates St. John's Hospital, located in Springfield, Illinois. St. John's Hospital is a tertiary care, private, not-for-profit teaching hospital affiliated with Southern Illinois University School of Medicine. It provides approximately 800 beds. There are two other hospitals located in Springfield, Illinois: Memorial Medical Center, a somewhat smaller, comparable tertiary care hospital and Humana Hospital of Springfield (formerly Springfield Community Hospital), a much smaller, for-profit institution that does not provide tertiary care.

Dr. Nickey came to Springfield in 1969 and entered into a contract with St. John's Hospital, the terms of which provided that Dr. Nickey would be responsible for the pathology department at the Hospital. Dr. Nickey replaced a group of pathologists who had been terminated by St. John's.

Within one month of coming to St. John's, Dr. Nickey recruited Dr. Van Fossan. APL was formed by the two doctors on February 1, 1969. Dr. Herschel Fulcher (deceased March 1983) joined APL in 1969, and the pathology group added Dr. Victor Lary in 1970. APL entered into a new contract with St. John's Hospital on July 1, 1970.

In 1974, APL hired Dr. Alfonso J. Strano and Dr. James G.P. Collins. Both Dr. Collins and Dr. Strano became shareholders in APL less than one year after they were hired by the corporation. Each of the individual doctors were employed by APL under identical written employment contracts.

The employment contracts between the individual doctors and APL were of one year duration subject to annual renewal. These contracts provided for compensation in the form of a salary, contributions to pension and profit sharing plans, and a possible bonus. The By-laws of APL provided that this bonus was to be awarded at the discretion of the directors. The doctors' contracts did not specify that a bonus would be paid, nor did the contract specify the amount of bonus or method of calculation.

From 1971 to the present, APL has awarded bonuses each year. APL's corporate records reflect the actions of the Board of Directors with respect to bonuses. Each pathologist did receive a bonus until the years 1980 and 1981.

APL did not award Dr. Collins a bonus in either 1980 or 1981. The directors of APL asked for and received Dr. Collins' resignation from APL, effective January 31, 1982. After leaving APL, Dr. Collins requested

St. John's Hospital to hire him as a pathologist on an individual basis, but St. John's refused to do so. Dr. Collins has maintained staff privileges at St. John's Hospital on a leave of absence of basis since 1982. He is currently employed as a pathologist at Humana Hospital in California.

APL's relationship with St. John's Hospital has been governed by successive contracts: the February 1, 1969 contract, the July 1, 1970 contract, the December 31, 1975 contract, and the October 1, 1983 contract. The first three of these contracts stated that APL would "provide complete and adequate professional pathology services" to St. John's Hospital, while the October 1, 1983 contract provides an expanded form of this language at paragraph 4 of the section, "Agreements of the Corporation." Each of the St. John's/APL contracts contain a provision allowing termination of the contract at any time upon 90 days notice, effective either immediately or after the first year of the contract.

The contracts of 1969, 1970 and 1975 do not contain any provision dealing with St. John's Hospital's right to hire additional pathologists or groups of pathologists. The October 1, 1983 written agreement authorizes in paragraph 5 of "Mutual Agreements" that "The Hospital may employ additional pathologists or groups of pathologists to perform services in pathology for the Hospital based on the needs of the Hospital, its medical staff, and patients. The Hospital may permit such persons to have the use of the Hospital facilities based on reasonable schedules and conditions."

St. John's and the other hospitals in Springfield draw their patients from the Springfield standard metropolitan statistical area (the "Springfield SMSA") which includes Springfield and the surrounding areas of Sangamon and Menard Counties. In 1980, the United States Census showed the population of Springfield to be 187,789 people, most of whom reside in Springfield and the surrounding area of Sangamon County. The residents of the Springfield SMSA rely almost exclusively on the hospitals in Springfield. A statewide patient origin study prepared by the Illinois Hospital Association shows that in 1981 approximately 97.3% of all persons in Sangamon County who were hospitalized, and approximately 92.2% of all persons in Menard County who were hospitalized, received hospital care from one of the three hospitals in Springfield.

The Springfield hospitals, primarily St. John's and Memorial, also attract patients from other nearby counties. The patient origin study shows that 23% to 39% of the persons in Cass, Christian, Logan, Macoupin, Montgomery, Morgan and Scott Counties sought hospital care at one of the three hospitals in Springfield, Illinois. Generally, the patients from the City of Springfield and Sangamon, Menard, or Cass Counties receive the entire range of hospital care, whereas those patients at St. John's from surrounding counties are there for more specialized treatment. These specialized or tertiary care services include services provided by medical practitioners specializing in neorosurgery, nephrology, neonatalogy, and the like. Such services are not available at the small hospitals in the area.

## EXCLUSIVE DEALING CONTRACT

The Plaintiff's main antitrust claims are based upon § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. That section makes it unlawful for anyone to contract, combine in the form of a trust or otherwise, or conspire, in restraint of trade or commerce among the several states. Based upon this section, the Plaintiff alleges that the contract between APL and St. John's Hospital is a combination in restraint of trade, an unlawful boycott, and an unlawful tying agreement. (Counts I and III).

The Plaintiff argues that the agreements entered into between St. John's Hospital and APL are unreasonable restraints of trade because they are exclusive contracts which require that any pathology work to be performed at St. John's Hospital must be performed by APL. The Plaintiff contends that because these agreements are exclusive, they have substantially foreclosed competition in the market of providing pathological services. Moreover, these agreements have foreclosed competition in an illegal manner because the exclusive

contracts are neither reasonable nor necessary.

There does seem to be a factual issue with regard to whether the agreements between APL and St. John's are, in fact, exclusive. The Defendants argue that the word exclusive never appears in any of the St. John's/APL agreements, but the Plaintiff responds that over the years, the parties to the agreements have operated as if they were exclusive. The Court finds that even though such a factual dispute exists, it does not prevent the Court from entering summary judgment on this issue, because the factual dispute is not material to the Court's decision on this issue. Rather, the Court concludes that summary judgment in favor of the Defendants is appropriate because the agreements are not an unreasonable restraint of trade even if they operate as exclusive contracts.

■ Cases interpreting the Sherman Act make it clear that all exclusive contracts are not violations of the Sherman Act because they are not necessarily an unreasonable restraint of trade. The United States Supreme Court in *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), established that a court must use a rule of reason approach to analyze an exclusive dealing contract and must determine the effect which the contract has upon competition in the relevant market place when deciding whether a contract has violated the Sherman Act.

In *Tampa Electric*, Tampa Electric Company entered into an agreement whereby Potter Towing Company and its successor to the contract, West Kentucky Coal Company, agreed to supply Tampa Electric's total requirement of coal for the operation of a coal-burning plant for 20 years. The lawsuit arose when the Coal Company informed Tampa Electric that the contract was illegal under the antitrust laws and it would not perform.

Even though the case involved application of § 3 of the Clayton Act, 15 U.S.C. § 14, the analysis used by the Court has been applied to other requirements contracts or exclusive-dealing cases. (The Court itself acknowledged that under its

analysis, the contract did not violate § 1 and § 2 of the Sherman Act. *Id.* at 335, 81 S.Ct. at 632). The Court began by pointing out that all exclusive-dealing arrangements are not unlawful, but only those that foreclose competition in a substantial share of the line of commerce affected. The threatened foreclosure must be in relation to the market affected, which involves determining the type of goods involved and the market area in which the seller operates and within which the purchaser can practicably turn for supplies. The last step in this analysis is a determination of whether the competition foreclosed by the contract constitutes a substantial share of the relevant market, that is, whether the opportunities for other traders to enter into or remain in that market are significantly limited by the contract. 365 U.S. at 327–28, 81 S.Ct. at 628.

In the *Tampa Electric* case, the Court decided that the relevant line of commerce was bituminous coal and compared the estimated amount of coal under the contract with the amount of coal produced and sold by the producers who could have also effectively competed for Tampa Electric's business. The Court found that even though the contract involved a large amount of coal and a significant dollar value, the purchase was quite insubstantial in terms of the total amount of coal produced in the relevant multi-state area. The Court acknowledged that the contract did pre-empt competition to a certain degree, but it did not substantially foreclose competition in the relevant coal market because of the amount of trade in coal which still existed in the relevant geographic area.

In the present case, the Plaintiff contends that the contracts in effect between St. John's Hospital and Associated Pathologists required that all pathology work done at St. John's Hospital and on St. John's patients was to be performed by doctors of APL. The Plaintiff argues that the relevant product market for the Court's inquiry is the provision of pathological services to patients and that the agreements foreclosed competition among pathologists to provide such services. To be more spe-

cific, the exclusive agreements prevented patients at St. John's Hospital from having their pathology work done by anyone other than an APL doctor, and they prevented pathologists who were not APL members from offering his or her services to a patient at St. John's. The Plaintiff contends that the exclusive agreements had an adverse effect upon competition in the area of pathological services, because competition among pathologists would result in lower prices and/or increased quality of pathological work done for St. John's patients.

While the arguments advanced by the Plaintiff have some appeal, the Court believes that the focus of the Plaintiff's arguments are misdirected in the context of a claim that the exclusive dealing arrangement is an unfair restraint on competition. The Supreme Court in *Tampa Electric* analyzed the situation before it in terms of whether the requirements contract foreclosed coal producers from the opportunity to sell their product. The Court did not suggest that the inquiry should focus upon the impact on consumers who would be purchasing the electricity generated by the coal-purchasing electric company. Rather, in defining the relevant market, the Court looked to the location of coal companies who could have supplied Tampa Electric Company and concluded that the relevant market area was the area in which these coal companies did in fact compete for buyers of their coal. The *Tampa Electric* Court used this type of analysis to define the relevant market because the purpose of its antitrust inquiry into the exclusive requirements contract was to determine the extent to which the contract preempted or foreclosed competition in the sense that the amount of coal under the contract was no longer a possible sale for competing coal producers.

In the present case, St. John's Hospital is in the position of Tampa Electric Company, and APL is situated similarly to the supplying coal companies, because the Hospital has agreed to use APL for whatever pathological services it needs. In determining

whether this exclusive arrangement forecloses competition, then, the focus is upon competition from the point of view of whether other pathological jobs are available in the relevant market and how many such jobs are available in comparison with the number of job opportunities foreclosed by the arrangement between the Hospital and APL. This means that one must view the situation from the point of view of pathologists competing for work, rather than from the point of view of patients in the Hospital and the choices available (or foreclosed) to them when they need pathological services.

The Court finds support for this method of analyzing the present situation in the United States Supreme Court case of *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed. 2d 2 (1984). The main focus of the Court's opinion in *Jefferson Parish* was upon the plaintiff's, Dr. Hyde's, claim that the exclusive arrangement between Jefferson Parish Hospital and a firm of anesthesiologists was an illegal tying arrangement because users of the hospital's operating rooms were compelled to purchase the hospital's chosen anesthesia service rather than services provided by competing anesthesiologists.[1]

The Court in *Jefferson Parish* addressed the claim that the contract between the hospital and the anesthesiological firm violated the Sherman Act because it unreasonably restrained competition. The Court explained:

"That burden necessarily involves an inquiry into the actual effect of the exclusive contract on competition among anesthesiologists. This competition takes place in a market that has not been defined. The market is not necessarily the same as the market in which hospitals compete in offering services to patients; it may encompass competition among anesthesiologists for exclusive contracts such as the Roux contract [the contract between the hospital and the anesthesio-

---

**1.** The present case also presents a claim of an illegal tying arrangement, but that is a separate issue from the analysis of the exclusive arrangement between St. John's Hospital and APL, and the Court will discuss that issue in a later section.

logical firm] and might be statewide or merely local." 466 U.S. at 29, 104 S.Ct. at 1567.

The *Jefferson Parish* Court then went on to explain in a footnote:

"The effect of the contract has, of course, been to remove the East Jefferson Hospital from the market open to Roux's competitors. Like any exclusive requirements contract, this contract could be unlawful if it foreclosed so much of the market from penetration by Roux's competitors as to unreasonably restrain competition in the affected market, the market for anesthesiological services." See generally *Tampa Electric Co. v. Nashville Coal Company*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *United States v. Standard Oil Co.*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). 466 U.S. at 30 n. 51, 104 S.Ct. at 1568 n. 51.

The Court in *Jefferson Parish* reviewed the evidence presented at trial and concluded that there was insufficient evidence in the record to provide a basis for finding that the Roux contract, as it actually operated in the market, had unreasonably restrained competition.

Even though the present case is before the Court on a Motion for Summary Judgment, the Court finds that the Plaintiff has not met his burden of showing that there is a genuine issue of material fact as to the anticompetitive effect of the exclusive contract in light of the Defendants' Motions for Summary Judgment. The Plaintiff has strenuously argued that the exclusive arrangement foreclosed patients at St. John's from choosing particular pathologists not associated with APL and likewise foreclosed pathologists not associated with APL from the opportunity to perform pathological services for patients at St. John's. However, as the Seventh Circuit suggested in the case of *Dos Santos v. Columbus*, 684 F.2d 1346 (7th Cir.1982), another case involving an exclusive arrangement between a hospital and an anesthesiological firm:

"Because the patient generally takes no part in the selection of a particular anes-thesiologist (the surgeon makes the choice) ... and because the expense of anesthesia services to the patient is ordinarily at least patially insured or otherwise payable by a third party, it might be somewhat anomalous to treat the patient as a buyer.... It may thus be more appropriate for antitrust purposes to treat the *hospital* as the purchaser, in view of the hospital's responsibility for assuring the availability of anesthesia services for its patients, its incentive to maximize the use of its surgical facilities, and its potential liability for negligent rendition of anesthesia services in its operating rooms. If the hospital rather than the individual patient is regarded as the purchaser, the relevant market could be defined as the area in which Associates [the anesthesiological firm] operates and in which the Medical Center (rather than the patient) can practicably turn for alternative provision of anesthesia services." 684 F.2d at 1354.

■ This Court believes that the Seventh Circuit accurately described the analysis which this Court should use in analyzing the anticompetitive effect of the exclusive arrangement between St. John's Hospital and APL, an approach which the Court described above in its citation to *Tampa Electric Company.* Under such an analysis, the Plaintiff has failed to present any evidence of what the relevant market would be, and the only evidence in the record is that a nationwide market exists for hospitals to hire pathologists (and for pathologists to seek employment with hospitals). This conclusion is supported by the fact that most of the doctors employed by APL during the years in question were from out of state, including Dr. Collins, who originally came to Springfield from New York. Furthermore, in seeking new employment after his employment with APL was terminated, Dr. Collins' search extended far beyond Springfield and even Illinois, because he eventually obtained a job in California.

What this means is that even though pathologists (such as Dr. Collins) not associated with APL are foreclosed from prac-

ticing at St. John's Hospital, there still exists many opportunities in hospitals nationwide to pursue a career elsewhere. The real market by which the Court must assess the anticompetitive effect of this exclusive arrangement is the market hospitals look to in hiring pathologists, and the Plaintiff has failed to show that this market is anything but nationwide.

The Court notes that a pathologist may indeed be foreclosed from pursuing a career in pathology in Springfield, Illinois because of the exclusive arrangement between St. John's Hospital and APL. However, the Court believes that to conclude from this that the defendants violated § 1 of the Sherman Antitrust Act involves viewing the present situation too narrowly. Following this line of thinking, any contract between two parties would become an unlawful exclusive arrangement because it would have the effect of foreclosing competition *for that particular business.*

Dr. Collins' claim that the exclusive arrangement between St. John's and APL has foreclosed him from practicing pathology in Springfield is really no different from the hypothetical claim that he would have been foreclosed from competition in Springfield if St. John's hired pathologists individually and had refused to hire Dr. Collins because the Hospital had a full complement of pathologists and did not have an opening for him. Dr. Collins claims that he has been prevented from practicing pathology in Springfield, and yet he has not made Memorial Hospital a party to this lawsuit, even though each of the individual contracts which Memorial has entered into with its pathologists has prevented him from filling a position on Memorial's staff. Because a substantial number of other opportunities are still available to Dr. Collins (and other pathologists) for practicing pathology (even though not necessarily in Springfield) despite the exclusive arrangement between St. John's and APL, the Court finds that there is no genuine issue of material fact in dispute regarding the effect of the agreement on competition. The Court grants summary judgment in favor of the Defendant on the Plaintiff's claims under § 1 of the Sherman Act,

which allege a combination or contract in restraint of trade.

The Court adds that Dr. Collins has not raised any issue of fact with regard to his ability to put together his own group of pathologists that could compete for the contract which St. John's Hospital has with APL. The exclusive arrangement that APL has with St. John's Hospital was terminable by either party on 90 days notice, which suggests that St. John's can cancel the contract if another pathological service makes a better bid (in terms of prices and/or quality of services) to supply the package of pathological services which APL supplies. This approach indeed involves competition, not at the level of each individual lab test that must be performed for a patient, nor at the level of competition among individual pathologists for one or more job openings available at a hospital. This competition, rather, involves the right to provide the Hospital with the entire package of pathological services which the Hospital (because of its patients) requires. The Court is not aware of any evidence which would suggest that competition at this level is necessarily detrimental to consumers, whether one regards those consumers as the Hospital or the patients themselves.

■ The mere fact that one aspiring competitor has been refused a job does not entitle him to a remedy under the antitrust laws, because the antitrust laws are designed to protect competition, not competitors. *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). The materials presented in support and in opposition to the Defendants' Motions for Summary Judgment show that this exclusive arrangement has not foreclosed competition among pathologists for work opportunities in the relevant hiring market, and the Court orders that summary judgment is granted for the Defendants on the Plaintiff's § 1 claim of an unreasonable restraint on competition.

BOYCOTT

In his memorandum in response to the Defendants' Motions for Summary Judg-

ment, the Plaintiff for the first time argues that the exclusive agreement between APL and St. John's Hospital constitutes an illegal boycott which violates § 1 of the Antitrust Act. The complaint does not specifically allege that the doctors and the Hospital engaged in an illegal boycott, but Count I does allege that the Defendants engaged in a combination in restraint of trade, and such language is broad enough to encompass the idea of an illegal boycott. The Plaintiff argues, however, that boycotts are illegal *per se* under the antitrust laws. According to the Plaintiff, if the Court is to grant summary judgment, it ought to grant summary judgment in favor of the Plaintiff, because there is no dispute but that such an illegal boycott or concerted refusal does exist.

■ The law with regard to illegal boycotts is somewhat unclear, because of the general language used in some older Supreme Court cases which suggests that all boycotts are illegal *per se*. For example, in the case of *United States v. General Motors*, 384 U.S. 127, 145, 86 S.Ct. 1321, 1330, 16 L.Ed.2d 415 (1964), the Court stated, "There can be no doubt that the effect of the combination or conspiracy here was to restrain trade and commerce within the meaning of the Sherman Act. Elimination, by joint collaborative action, of discounters from access to the market is a *per se* violation of the Act." The Court then went on to say:

> "[W]here businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation underlying their conduct. (Citation omitted). Exclusion of traders from the market by means of combination or conspiracy is so inconsistent with the free-market principles embodied in the Sherman Act that it is not to be saved by reference to the need for preserving the collaborators' profit margins or their system for distributing automobiles, any more than by reference to the allegedly tortious conduct against which a combination or conspiracy may be directed—as in *Fashion Originators' Guild of America, Inc. v.*

*Federal Trade Commission*, 312 U.S. 457, 468 [61 S.Ct. 703, 708, 85 L.Ed. 949] (1941)." *Id.* at 146–47, 86 S.Ct. at 1331.

Such language, argues the Plaintiff, is applicable to the instant case because the facts clearly establish that the members of APL exerted pressure upon St. John's Hospital in order to induce the Hospital not to hire Dr. Collins after APL had terminated his employment with them. According to this reasoning, because the Court is to apply the *per se* standard of illegality to these actions, there can be no dispute but that the Defendants violated the § 1 of the Sherman Antitrust Act.

More recently, the Seventh Circuit has explained its own understanding of illegal boycotts in cases such as *U.S. Trotting Association v. Chicago Down Association, Inc.*, 665 F.2d 781 (7th Cir.1981). In *U.S. Trotting*, the Court began its discussion of the plaintiff's antitrust claims by stating that the rule of reason is the standard traditionally applied for the majority of anticompetitive practices challenged under § 1 of the Sherman Act. However, a particular course of conduct will be termed a *per se* violation of the Act after courts have had considerable experience with the type of conduct challenged and application of the rule of reason has inevitably resulted in a finding of anticompetitive effects. 665 F.2d at 787–88. The court explained that the Supreme Court has found certain group boycotts illegal *per se*, but that a *per se* rule had never been applied by the Supreme Court to concerted refusals to deal which were not designed to drive out competitors. The Court then went on to say that it would analyze the group activity alleged in the case before it under a rule of reason standard rather than a *per se* rule. *Id.* at 788.

Elaborating on this further in the case of *Marrese v. American Academy of Orthopaedic Surgeons*, 706 F.2d 1488 (7th Cir. 1983), *vacated on other grounds*, 726 F.2d 1150 (7th Cir.1984), *rev'd*, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985), the Seventh Circuit set forth a general statement of the law of boycotts: "[B]oycotts are

illegal per se only if they are used to enforce agreements that are themselves illegal per se—for example price-fixing agreements." 706 F.2d at 1495. The Court explained that the antitrust laws are concerned with the welfare of consumers rather than individual competitors, and it is only with this orientation in mind that a court can decide whether a boycott should be viewed as *per se* illegal. Moreover, the Seventh Circuit stated in *Wilk v. American Medical Association*, 719 F.2d 207, 221 (7th Cir.1983), when a conspiracy is alleged in the context of a profession and the evidence shows that the purpose of the conspiracy is not to compel doctors to engage in certain economic behavior vis-a-vis consumers, such as price fixing, then the nature and extent of the anticompetitive effects of the boycott are too uncertain to be amenable to *per se* treatment, as contrasted with treatment under the rule of reasons.

The Plaintiff cites the Third Circuit case of *Weiss v. York Hospital*, 745 F.2d 786 (3rd Cir.1984), for the proposition that a boycott, even involving the medical profession, should be analyzed under a *per se* rule of illegality. However, as the court in *Weiss* clearly explained, that case involved allegations that a hospital and its medical staff acted to exclude all osteopathic physicians (D.O.s) from its staff without considering each osteopath's application for staff privileges on a case-by-case basis. The court concluded that the case could be viewed as an example of a concerted refusal to deal or a boycott because the medical doctors (M.D.s) who staffed the hospital were the equivalent of retailers who had banded together to cause the hospital (the equivalent of a manufacturer) to exclude their competitors, the D.O.s. 745 F.2d at 819.

The court explained that because the M.D.s controlled the hospital's admission decisions, the case was similar to the situation where a group of firms at one level of distribution, the doctors' level, had used their existing relationship with a supplier to exclude their competitors from dealing with the supplier. The court, however, acknowledged that the facts of the case did not precisely fit into the mold of a classical refusal to deal because of its similarity to a discrimination case against all osteopaths. *Id.* at 819–20. The court added that the Medical Staff was entitled to exclude individual doctors, whether M.D.s or O.D.s, on the basis of their lack of professional competence or other unprofessional conduct. *Id.* at 820. However, the Third Circuit chose to apply a *per se* rule to the alleged boycott because the complaint contained allegations that the hospital applied two different standards when reviewing applications for privileges from M.D.s and D.O.s. The Court elaborated on this idea in a footnote, explaining that because of a hospital's "public service" function, a hospital's decision to restrict staff privileges on the basis of medical ability or professional conduct can be "pro-competitive action" and would be analyzed under a rule of reason. *Id.* at 820–21 n. 60.

■ The Court believes that under the facts of the present case, the Plaintiff's allegation of a group boycott or concerted refusal to deal under § 1 of the Sherman Act (if indeed such a theory can be read into the complaint) must be analyzed under the rule of reason and is not a *per se* violation. This case is different from *Weiss* because there was no combination of firms or competitors on the distribution level which could have put pressure on the supplier (hospital) level; all of the individual Defendants were members of the same business, APL, and only that single business could have tried to apply pressure to St. John's. Moreover, the Plaintiff does not allege that he is part of a group that has been discriminated against by means of a different standard for judging professional competence. Rather, this case is similar to that type described in the footnote, in which hospitals have refused to grant staff privileges pursuant to their "public service" function. Under such an analysis, not only does the Plaintiff have the burden of proving that the Defendants did indeed engage in illegal antitrust activities, but the Plaintiff must also show that the activities had an anticompetitive effect upon the relevant market that could not be justified

by whatever procompetitive effects might result from the activities.

■ Applying this standard to the Defendants' Motions for Summary Judgment, the Court finds that there is no genuine issue of material fact regarding the Plaintiff's claim of an illegal group boycott, and the Court orders that the Defendants' Motions for Summary Judgment are granted.

In the case of *Monsanto Company v. Spray–Rite Service Corporation*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Supreme Court dealt with the issue of the standard of proof required to find a vertical price-fixing conspiracy in violation of § 1 of the Sherman Act. In *Monsanto*, Spray–Rite had claimed that Monsanto terminated its distributorship as part of a price-fixing conspiracy among Monsanto and its other distributors. Even though the Court did not actually discuss the case in terms of a group boycott or concerted refusal to deal, the issue arose of whether Monsanto had acted unilaterally or in concert with the other defendants when it terminated Spray–Rite's distributorship. The Court held that evidence that Monsanto had received complaints from other dealers was insufficient to support a finding that there had been concerted action among the dealers and Monsanto. The standard as enunciated by the Supreme Court is: "There must be evidence that tends to exclude the possibility that the manufacturer and non-terminated distributors were acting independently," thus putting the burden on the plaintiff to present evidence that would foreclose the possibility of independent action. 465 U.S. at 767, 104 S.Ct. at 1472.

This same standard is applicable to the facts of the case before the Court, because the Plaintiff alleges that the Defendants conspired to prevent St. John's Hospital from hiring the Plaintiff. The Defendants, on the other hand, argue that the Hospital had the right to make its own decision and did, in fact, make its own independent decision regarding whether to hire Dr. Collins after APL had terminated his employment. The Court believes that the Plaintiff has not met his burden of presenting evidence that would preclude entry of a directed verdict in favor of the Defendants under the standard announced by the Supreme Court in *Monsanto* for concerted action under § 1 of the Sherman Act.

The Plaintiff has suggested that APL used its influence to cause the Hospital to refrain from hiring Dr. Collins, but the only evidence presented on this issue was that Theodore Druhot, Executive Vice President of St. John's had discussions with the members of APL prior to telling Dr. Collins that he would not hire him with an independent contract. This is not the type of evidence which excludes the possibility of independent action, because the Hospital had the right to make an administrative decision not to hire Dr. Collins. St. John's Hospital had the right to hire or not hire Dr. Collins as an independent pathologist, based upon its perceived need for pathologists in addition to those working for APL. To suggest that APL used its influence to cause St. John's Hospital to reach this decision is merely to suggest that APL wanted St. John's to abide by the terms of its contract with APL, in which the Hospital agreed that APL would provide complete and adequate professional pathology services.

As the Court explained in the previous section of this Order, the "exclusive" agreement between the Hospital and APL is not a restraint of trade in violation of the Sherman Act. Thus, the Court cannot conclude otherwise but that the Hospital did not violate antitrust laws when it chose to abide by the terms of the agreement and not hire Dr. Collins as an additional pathologist. Any contract can be characterized as an exclusive agreement to deal with a particular entity and not deal with others depending upon the scale at which it is viewed; this does not mean that every contract is an illegal boycott or concerted refusal to deal between the contracting parties merely because others are foreclosed from competing for that same business. Therefore, with regard to the Plaintiff's claims under § 1 that the Defendant engaged in a boycott that should be judged *per se* illegal, the Court finds that the rule

of reason is the applicable standard and orders that the Defendants' Motions for Summary Judgment are granted.

## ILLEGAL TYING

In Count III of the complaint, the Plaintiff makes a claim that the contract between APL and St. John's Hospital resulted in an unlawful tying arrangement that violated § 1 of the Sherman Act. Generally, a claim for unlawful tying involves a seller, who has market power in a particular product or service, who requires buyers of that product or service to also purchase a second and separate product or service (the tied product) as a condition of their original purchase. As courts have explained, the problem with tying arrangements is that they allow a seller with market power in one product to impair competition on the merits in another market, forcing consumers to make a purchasing decision based on other than competitive pressures in the market for the tied product. In this case, the Plaintiff alleges that the Hospital, having market power in the provision of hospital rooms and facilities, has used the exclusive arrangement with APL to force patients to purchase pathological services from APL physicians. The Plaintiff claims that this is an unlawful tying arrangement because the effect is to stifle competition among the providers of pathological services.

A recent United States Supreme Court case has discussed this type of tying claim in the context of the medical profession and an agreement between a hospital and a group of doctors. In *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), the Supreme Court held that the contractual arrangement between the hospital and a firm that supplied anesthesiological services was not an unlawful tying arrangement because the plaintiff could not show that the hospital had sufficient market power to force patients to purchase anesthesiological services from the hospital's anesthesiological group. The Court found that the provision of anesthesiological services and other hospital services involved two separate products, but the defendant hospital did not

have a dominant or even substantial share of the market for patients in the relevant market area. This meant that patients who preferred not to use the services of the hospital's anesthesiological firm could go to a competing hospital and use the services of another anesthesiologist.

The Plaintiff in the present case argues that he has made out a good claim of an unlawful tying arrangement based upon the analysis of *Jefferson Parish*, because St. John's Hospital has at least an equal, if not dominant, market position with the other hospital in Springfield that provides tertiary care to its patients. Under these facts, the Plaintiff argues that not only is the tying arrangement illegal, but it is illegal *per se* and there is no need for the Court to inquire into the actual market effects of the tying arrangement.

■ The Court does not feel it would be proper to scrutinize this alleged tying arrangement under a *per se* rule rather than a rule of reason. Although the Plaintiff is correct in citing numerous cases for the proposition that tying arrangements are illegal *per se*, the Supreme Court in *Jefferson Parish* seemed to substantially "soften" this position in its analysis of the alleged tying arrangement which it was reviewing. The Court said:

"*Per se* condemnation—condemnation without inquiry into actual market conditions—is only appropriate if the existence of forcing is probable. (Footnote omitted). Thus, application of the *per se* rule focuses on the probability of anticompetitive consequences. Of course, as a threshold matter there must be a substantial potential for impact on competition in order to justify *per se* condemnation. 466 U.S. at 15–16, 104 S.Ct. at 1560.

\* \* \* \* \* \*

[A]ny inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact. Thus, in this case our analysis of the tying issue must focus on the hospital's sale of services to its patients, rather than its contractual

arrangements with the providers of anesthesiological services. In making that analysis we must consider whether petitioners are selling two separate products that may be tied together, and, if so, whether they have used their market power to force their patients to accept the tying arrangement." *Id.* at 18, 104 S.Ct. at 1561.

The Court reads this language as a modification of the strict *per se* rule which courts have used in antitrust cases dealing with price-fixing. As the concurring opinion of Justice O'Connor, joined in by three other Justices, says:

"Some of our earlier cases did indeed declare that tying arrangements serve 'hardly any purpose beyond the suppression of competition.' *Standard Oil Co. of California v. United States*, 337 U.S. 293, 305–306, 69 S.Ct. 1051, 1058, 93 L.Ed 1371 (1949) (dictum). However, this declaration was not taken literally even by the cases that purported to rely upon it. In practice, a tie has been illegal only if the seller is shown to have 'sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product ...' *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)." 466 U.S. at 34, 104 S.Ct. at 1569.

Justice O'Connor explained, "[T]he *per se* label in the tying context has generated more confusion than coherent law because it appears to invite lower courts to omit the analysis of economic circumstances of the tie that has always been a necessary element of tying analysis." *Id.* at 34–35, 104 S.Ct. at 1570. The concurring Justices concluded that the *per se* rule should be applied only in those few instances where a horizontal or quasi-horizontal restraint has no economic justification whatsoever, and most tying arrangements should be analyzed under the rule of reason, with an inquiry into the adverse economic effects and the potential economic benefits that the tying arrangement would have. *Id.*

■ Regardless of how courts in the future will characterize their approach to tying cases, the Court believes that this issue can be resolved at an earlier stage in the analysis. The Supreme Court in *Jefferson Parish* stated that the Court must consider whether two separate products are in fact being tied together, and this Court concludes that as a matter of law the Plaintiff has not stated a claim for an unlawful tying arrangement because the provision of hospital services and pathological services are not two separate and distinct products.

The Supreme Court in *Jefferson Parish* said that the analysis of whether one or two products are involved in an alleged tying scheme "turns not on the functional relation between them, but rather *on the character of the demand for the two items.*" (Emphasis added). 466 U.S. at 19, 104 S.Ct. at 1562. On the specific facts of the case before it, the Supreme Court said, "[N]o tying arrangement can exist unless there is a sufficient demand for the purchase of anesthesiological services separate from hospital services to identify a distinct product market in which it is efficient to offer anesthesiological services separately from hospital services." *Id.* 21–22, 104 S.Ct. at 1563. The Court then held that there was ample evidence that anesthesiological services and other hospital services provided by the defendant hospital were distinct and separate products, based upon the fact that patients or surgeons often requested specific anesthesiologists. The Court found that the choice of an individual anesthesiologist was particularly frequent in the plaintiff's specialty of obstetric anesthesiology, and a surgeon normally selects an anesthesiologist based on his familiarity with that anesthesiologist gained through a working relationship.

On these same facts, however, the four concurring Supreme Court Justices concluded that there was no sound economic reason for treating surgery and anesthesia as separate services, because patients are interested in purchasing anesthesia only in conjunction with hospital services. Furthermore, the hospital could acquire no additional market power by selling the two services together. According to the concurring Justices, "[T]he link between the hospital's services and anesthesia adminis-

tered by Roux will affect neither the amount of anesthesia provided nor the combined price of anesthesia and surgery for those who choose to become the hospital's patients. In these circumstances, anesthesia and surgical services should not be characterized as distinct products for tying purposes." *Id.* at 43, 104 S.Ct. at 1574.

The Court finds that there are enough factual distinctions between *Jefferson Parish* and the present case to conclude as a matter of law that the provision of pathological services is not a separate product from the other services routinely offered by a hospital. The evidence presented along with the motions for summary judgment and the Plaintiff's opposition show that the vast majority of work performed by pathologists involve laboratory tests and analyses that require the pathologist to rely a great deal upon the hospital's physical facilities and equipment. Thus, it is easy to see the pathologist as similar to an employee of the hospital rather than an independent contractor hired by the hospital for each specific task he must perform. The evidence shows that there is some demand for pathological services on an outpatient basis, not in connection with the provision of other hospital services, but the number of such requests are insubstantial when compared to the amount of pathological work done for hospital-based patients. In addition, the work of a pathologist is laboratory based, so there is not the close, face-to-face contact between the physician and the patient as there is in the practice of anesthesiology. Finally, the evidence is overwhelming that patients never request specific pathologists, and it is only on rare occasions that physicians themselves request the services of a specific pathologist. After reviewing all of this evidence, the Court finds there is no genuine issue of material fact and concludes that pathological services cannot be viewed as a separate and distinct product from the facilities and other services which a hospital provides for its patients.

The Court points out that from the perspective of the patient receiving the benefit of the pathological services (or the patient's doctor requesting that certain pathological tests be performed), the St. John's/APL agreement, in effect, resembles the situation where a hospital has hired a specific number of pathologists on an individual basis to perform pathology work for the hospital. The Plaintiff has submitted no evidence that it is the routine practice of hospitals to grant staff privileges to large numbers of pathologists, as is done with other types of physicians, so that these physicians can have their patients admitted into a hospital and receive treatment without changing physicians. If a hospital hires four pathologists by means of individual contracts, or purchases the services of a pathology group that provides the hospital with four pathologists, patients in that hospital (and doctors with patients in that hospital) have four pathologists from which to choose for their pathology work. In either scenario, the patients or their doctors have four (but only four) pathologists from which to choose, if, in fact, the patient or doctor is so inclined and well-enough informed to even make a choice about his pathologist.

Because pathologists are recognized as having a hospital-based practice rather than a practice oriented toward obtaining individual patients, the Court finds that pathological services are just one of the many services provided by a hospital for the care of its patients. The Plaintiff's claim of an unlawful tying arrangement between the Defendant Hospital and APL must fail on these Motions for Summary Judgment, because there are not separate and distinct products involved.

MONOPOLIZATION AND ATTEMPT TO MONOPOLIZE

The final federal antitrust claim which the Plaintiff brings is a claim against APL and the individual doctors of APL that the agreement between St. John's Hospital and APL violated § 2 of the Sherman Act, 15 U.S.C. § 2. Section 2 makes it unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person to monopolize any part of the trade or commerce among the several states. The Court has some difficulty in understanding the Plaintiff's claim of mo-

nopolization, but it appears that the complaint alleges that the APL Defendants monopolized or attempted to monopolize the provision of pathological services at St. John's Hospital and in the Springfield area by means of the St. John's/APL agreement.

In order to maintain a claim for monopolization or attempted monopolization in violation of § 2, a plaintiff must allege and prove that a defendant possesses monopoly power in the relevant market and the Defendant willfully acquired or maintained that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Monopoly power consists of "the power to control prices or exclude competition." Id. at 571, 86 S.Ct. at 1704. A claim for attempted monopolization is made out by a plaintiff who can show and prove that a competitor, with a "dangerous probability of success," engages in anticompetitive practices with the specific intent to build a monopoly or exclude or destroy competition. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1952). Finally, the essential elements of a conspiracy to monopolize are: an agreement or understanding between two or more economic entities; a specific intent to monopolize; and the commission of an overt act in furtherance of the alleged conspiracy. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 709–10, 82 S.Ct. 1404, 1416, 8 L.Ed.2d 777 (1962).

In the complaint, the Plaintiff alleges that the relevant product market by which these § 2 claims are to be measured is the market for pathological services provided by licensed pathologists. The Plaintiff alleges that the relevant geographic market can be considered on two levels: the Springfield area, and the patients at St. John's Hospital who require pathological services. The Plaintiff alleges that the agreement between St. John's and APL is an unlawful monopolization, attempted mo-

nopolization, and conspiracy to monopolize and maintain a monopoly because the APL Defendants have used the agreement to maintain their status as the sole supplier of pathological services to patients at St. John's and as a supplier of a substantial portion of the pathological services to patients in the Springfield area.

From this Court's previous discussions regarding the other antitrust claims, it follows that the Plaintiff's § 2 claims must also fail. The Court has already described its conclusion that the provision of pathological services is not a separate "product" or "service" from the other services provided by a hospital in caring for its patients. It would be anomalous, therefore, for the Court to say that even though pathological services did not constitute a separate product for purposes of a tying analysis, it did constitute a separate product market for purposes of a monopolization analysis. Because the Court finds as a matter of law that there is no relevant product market consisting of providing pathological services to individual patients, the Plaintiff must necessarily fail in his attempts to allege monopolization with regard to this product market.

Moreover, the Court believes that the Plaintiff is slicing the geographical market much too thin in arguing that the ALP Defendants have monopolized or attempted to monopolize the market for pathological services at St. John's Hospital. The definition of a relevant geographic market varies from case to case depending on the type of product and the geographical characteristics of an area, but the relevant geographic market must identify the area of effective competition that the defendant encounters when it offers its product or services for sale. *See, Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

In the present case, even though patients in St. John's Hospital do not have the choice of having doctors other than those from APL perform pathological work, they do have a choice prior to entering the hospital about which hospital they will enter, based upon factors such as

price, quality, the type of services, and the staff members (including pathologists) of the hospitals in the relevant geographic market. Therefore, it is incorrect to say that the patients in St. John's Hospital constitute a relevant geographic submarket for the provision of pathological services, when in fact they have a choice with regard to pathological services at the time they choose the particular hospital they will enter. The Court finds support for this view in the case of *Dos Santos v. Columbus–Cuneo–Cabrini Medical Center,* 684 F.2d 1346 (7th Cir.1982), where the Seventh Circuit, in discussing an exclusive contract involving Columbus Hospital and a firm of anesthesiologists said, "[W]e have reason to doubt whether the relevant market can be sliced so small as to embrace only a single hospital." 684 F.2d at 1353.

■ Finally, the Court finds that the Plaintiff cannot state a claim against the APL Defendants for monopolization or attempted monopolization of the Springfield market for pathological services, because the agreement between St. John's Hospital and APL involves the provision of pathological services to only St. John's Hospital. Consequently, the portion of the market for pathological services which APL can maintain or acquire is inextricably linked to the portion of the market for patients that St. John's Hospital serves. The APL Defendants cannot possibly maintain its current share or acquire a greater number of Springfield patients by means of the agreement in dispute here unless St. John's Hospital itself maintains its current market share or acquires a greater proportion of patients (specifically patients who require pathological services) in the Springfield area. Therefore, the Plaintiff cannot possibly bring a claim for monopolization or attempted monopolization of the Springfield market against the APL Defendants unless he also alleges that St. John's Hospital is engaged in illegal monopolization or attempted monopolization.

The Plaintiff has not made such allegations, and, in fact, in his brief in opposition to the motions for summary judgment, the Plaintiff admits that he has not alleged that St. John's has monopolized or attempted to monopolize any market. Furthermore, the evidence before the Court does not raise any genuine issue of fact regarding an attempt by St. John's Hospital to monopolize or to willfully maintain monopoly power over the patient market in the Springfield area. Because the agreement between the Hospital and APL links the amount of APL's busines with the number of patients treated by the Hospital, the Plaintiff cannot, as a matter of law, bring a claim of alleged monopolization or attempted monopolization against the APL Defendants without showing some type of effort at illegal monopolization on the part of St. John's Hospital as well. For all of the above reasons, the Court orders that the Defendants' Motions for Summary Judgment with regard to the § 2 monopolization claims of Count II is granted.

## ANTITRUST CLAIMS UNDER THE ILLINOIS ANTITRUST LAW

Relying on the factual allegations made out in Counts I, II, and III of his complaint, the Plaintiff also claims in Counts IV, V, and VI that the actions of the Defendants violated the Illinois Antitrust Act, Ill.Rev. Stat, ch. 38, § 60–3. Specifically, Count IV of the complaint realleges paragraphs of Count I of the complaint and claims that the Defendants combined and conspired to restrain commerce unreasonably in violation of § 60–3(2) of the Illinois Antitrust Act. Count V is a claim against the Defendants for unlawful monopolization and attempted monopolization, similar to Count II of the complaint, in violation of § 60–3(3) of the Illinois Antitrust Act. Finally, the Plaintiff relies upon Count III of the complaint to allege in Count VI that the Defendants engaged in an unlawful tying arrangement in violation of § 60–3(4) of the Illinois Antitrust Act.

■ The language of the relevant provisions of § 60–3 of the Illinois Antitrust Act is substantially similar to the language used in the federal antitrust laws. In particular, the language of § 60–3(2) closely tracks the language of § 1 of the Sherman Act, and § 60–3(3) is very similar to § 2 of the Sherman Antitrust Act. The Illinois

Antitrust Act concludes with § 60–11, which reads:

"When the language of this Act is the same or similar to the language of a Federal Anti-Trust Law, the courts of this state in construing this Act shall follow the construction given to the Federal Law by the Federal Courts."

Based upon this statutory language, the Court believes that the analysis it used earlier in this opinion to grant the Motions for Summary Judgment in favor of the Defendants on the combination in restraint of trade and monopolization/attempted monopolization claims is fully applicable under the Illinois Antitrust Statute. Therefore, the Court orders that the Defendants' Motions for Summary Judgment is granted with regard to Counts IV and V of the complaint.

■ The Court has had more difficulty in reaching a decision regarding the Plaintiff's claim under § 60–3(4) of the Illinois Antitrust Act (Count VI), because it is not exactly clear what standard the Court should use in assessing the allegations made in Count VI. In the case of *People ex rel. Scott v. Schwulst Building Center, Inc.*, 89 Ill.2d 365, 432 N.E.2d 855, 59 Ill. Dec. 911 (1982), the Illinois Supreme Court concluded that § 60–3(4) of the Illinois Antitrust Act should be construed as requiring application of a *per se* rule. The court reached this conclusion by finding that the provisions of the Illinois Act which use a rule of reason standard contain "reasonableness" language, and § 60–3(4) is patterned after § 3 of the Clayton Act, which, the court concluded, uses a *per se* analysis. If the Court were to accept this explanation on its face, then the Court would have to analyze the Plaintiff's claims in Count VI under a *per se* rule rather than the rule of reason analysis relied upon in earlier sections of this opinion.

The Court, however, is not convinced that it must undertake a different line of analysis which applies a *per se* standard in evaluating the Plaintiff's claims under § 60–3(4) of the Illinois Antitrust Act.

First, § 60–3(4) involves two separate categories of antitrust claims: exclusive dealing arrangements and unlawful tying arrangements. Even though Count VI of the complaint is captioned as a claim for an unlawful tying arrangement, the Plaintiff argues in his briefs that the complaint states a cause of action for an exclusive dealing contract under § 60–3(4) of the Illinois Antitrust Act. Even though the Plaintiff should have made it more clear in his complaint that he was bringing a complaint for an illegal exclusive dealing contract, the Court will analyze his claims under § 60–3(4) in terms of both of these types of antitrust violations.

Second, the Court believes that the Illinois Supreme Court overstated the legal conclusions which led it to hold that § 60–3(4) involved a *per se* analysis rather than a rule of reason standard in *Schwulst Building*. As this Court has pointed out, § 3(4) involves claims for both exclusive dealing contracts and tying arrangements, but the Illinois Supreme Court discussed § 3(4) only in terms of tying arrangements because the case before it involved a claim of an unlawful tying arrangement. This Court has already stated its position earlier in this opinion regarding whether courts should analyze tying arrangements under a *per se* rule or a rule of reason. Although older cases seem to suggest that tying arrangements are illegal *per se*, more recent decisions of the court have seemed to soften this approach by requiring some degree of analysis of market factors and the effect of the arrangement upon the market. *See, Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984).

Not only did the Illinois Supreme Court not distinguish between tying arrangements and exclusive contracts for purposes of establishing a standard under § 3(4) of the Illinois Antitrust Act, but the Court's decision was couched in rather conclusory terms. The Illinois Supreme Court correctly observed that § 3(4) is patterned after § 3 of the Clayton Act, 15 U.S.C. § 14 [2] and

---

**2.** The Clayton Act applies only to goods, whereas the Illinois Antitrust Act includes the word

"services." Therefore, the Illinois Act applies to

cited three United States Supreme Court cases for the proposition that a *per se* test is applied to allegations involving § 3 of the Clayton Act.

The Seventh Circuit, in *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 393 (7th Cir.1984), analyzed one of those cases, *Standard Oil Co. v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949), in light of more recent cases discussing exclusive-dealing contracts such as *Jefferson Parish Hospital* and *Tampa Electric Co. v. Nashville Coal Company*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). Based on its reading of these cases, the Seventh Circuit concluded:

> "[I]t now appears most unlikely that such [exclusive-dealing] agreements whether challenged under Section 3 of the Clayton Act or Section 1 of the Sherman Act, will be judged by the simple and strict test of *Standard Stations [Standard Oil Co. v. United States*, 337 U.S. 293, [69 S.Ct. 1051, 93 L.Ed. 1371] (1949)]. They will be judged under the Rule of Reason, and thus condemned only if found to restrain trade unreasonably." 749 F.2d at 393.

The Seventh Circuit had reached a similar conclusion in *Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163 (7th Cir. 1978), another case involving the Court's analysis of § 3 of the Clayton Act and § 1 of the Sherman Act. In *Lupia*, the Seventh Circuit stated:

> "[C]ourts have held that agreements with manufacturers that limit distributors' sales to products made by the manufacturer are not *per se* violations of antitrust law. Such an agreement is barred by section 3 of the Clayton Act only if its effect 'may be to substantially lessen competition or tend to create a monopoly in a line of commerce.'" 586 F.2d at 1172.

The Court indicated that a plaintiff "must allege some facts to demonstrate that defendant's marketing practices foreclosed competitors of the defendant from a substantial market." The Court affirmed the lower court's grant of summary judgment

the provision of services as well as the sale of

in favor of the defendant on the grounds that the plaintiff did not raise any issue of fact indicating that the defendant's anti-competitive practices caused injury to the plaintiff's competitive position in the relevant market. *Id.* at 1173.

In light of the recent developments in federal antitrust law, as explained by the Seventh Circuit and the United States Supreme Court, the Court believes that the Illinois Supreme Court's discussion of federal law in *Schwulst Building* is not completely accurate. Because the Court's conclusion in *Schwulst Building* purports to rely upon the incorrect interpretation of federal law, the Court does not believe it is bound to apply the literal holding of *Schwulst Building* that § 3(4) involves a *per se* analysis.

While the Illinois Supreme Court is at liberty to construe Illinois statutes differently than federal statutes using similar language, the Illinois Act itself instructs state courts to construe the Illinois Act in a manner consistent with federal antitrust laws when the statutory language of the two antitrust schemes are the same or similar. Consistent with this mandate and the most recent explanations of federal antitrust law given by the federal courts, this Court believes it is appropriate to analyze the § 3(4) claims, at least as they pertain to an exclusive dealing contract, under a rule of reason approach. The Court finds that its earlier analysis of the exclusive dealing contract under § 1 of the Sherman Act and the Supreme Court decision in *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961) is equally applicable to the Illinois Antitrust claim.

Moreover, regardless of whether Illinois courts would continue to apply a *per se* test in the area of tying arrangements (as was done by the court in *Schwulst Building*), the Court finds that the Plaintiff has failed to raise a genuine issue of material fact with regard to his unlawful tying claim under § 3(4) of the Illinois Antitrust Act. The Court holds as

goods.

a matter of law that the provision of pathological services is not separate and distinct from the provision of hospital services, and where there does not exist two separate products (or services), there can be no claim for an unlawful tying arrangement. The Court orders that the Defendants' Motions for Summary Judgment with regard to Count VI of the Complaint are granted.

## BREACH OF CONTRACT

Count VII of the complaint is a contract claim in which Dr. Collins alleges that APL breached the employment contract between APL and Dr. Collins by refusing to pay him a bonus in the years 1980 and 1981.[3] The Defendants take the position that the contract between Dr. Collins and APL which governed the years 1980 and 1981 did not provide that a bonus would be paid to any member of APL, but rather, permitted bonuses to be paid in the discretion of the directors of APL. The Defendants argue that the contractual language is unambiguous and leads to the conclusion the contract established only a mere expectancy of a bonus and did not require APL to make such payments.

Dr. Collins argues that because the employment contract contains only a general provision as to the payment of a yearly bonus, the Court should look to other documentary proof regarding the calculation and application of the bonus provision. Specifically, Dr. Collins suggests that a letter from Dr. Nickey, as president of APL, dated April 8, 1974, sets forth in detail the methodology for determining compensation for APL employees. According to the Plaintiff, that letter specifically promises Dr. Collins an equal share of each yearly bonus, concluding with the line, "[S]ave this letter for contract structuring purposes later." In addition, Dr. Collins also points out that prior to 1980, all of the pathologists of APL had received yearly bonuses which equalized the compensation paid to them.

Dr. Collins entered into his first contract with APL on June 15, 1974. That contract was replaced by an employment agreement signed by APL and Dr. Collins in 1977. According to that 1977 contract, "The Employee's compensation shall be fixed from time to time by the corporation's board of directors, and shall consist of a basic salary with or without supplementation by way of bonuses, special awards or allowances." Section 15 provides:

"(a) This Agreement constitutes the entire agreement between the parties and contains all of the agreement between the parties with respect to the subject matter hereof; this Agreement supercedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the subject matter hereof.

(b) No change or modification of this Agreement shall be valid unless the same be in writing and signed by the Employee and the Corporation. No waiver of any provision of this Agreement shall be valid unless in writing and signed by the person or party to be charge."

Judge Ackerman, in an order entered on October 7, 1982, discussed this same contract language in ruling on a Motion to Dismiss Dr. Collins' original complaint in this action. Judge Ackerman found that the written 1977 employment contract formed the complete agreement of the parties. He also found that the terms of the contract were not ambiguous and the Plaintiff "as a matter of law, is not entitled to 'share equally' in all income and revenue of the corporation."

■■■ Although the claims dismissed by Judge Ackerman are not identical to the present claims at issue, Judge Ackerman's ruling is dispositive on the issue of the compensation due under the contract. This Court's ruling reflects Judge Ackerman's order that the contract is not ambiguous and clearly establishes that the Plaintiff is not "entitled" to a share of the income and

---

**3.** Dr. Collins did receive bonuses for the years during which he was employed by APL prior to 1980, so the Court understands that he is chal-
lenging the Defendants' actions under only the 1977 Employment Agreement.

revenue of APL in the form of bonuses for 1980 and 1981.

The Court finds that the contract language quoted above unambiguously sets forth the compensation to which an APL member is entitled. It is clear from the contract that the payment of a bonus is within the discretion of the board of directors: the board is given the power to fix an employee's compensation, and there is no other language in the contract which limits that discretion or details how it must be exercised. The law is clear in Illinois that where the award of a bonus is discretionary, an employee may not compel payment as a matter of right. *Mosow v. National Lock Co.*, 119 Ill.App.2d 232, 255 N.E.2d 500 (2nd Dist.1970) (employee not entitled to receive a bonus where letters that indicated he would be a participant in a "contingent compensation plan" indicated that the decision whether to pay an employee a bonus was subject to the discretion of the board of directors).

Moreover, there is nothing in the evidence submitted by the parties which suggests that a particular predetermined formula was in place which established a means of calculating the amount of bonuses that would be paid to APL pathologists. Thus, not only does the contract establish that the bonus is discretionary, but the Court would not be able to enforce a contractual term requiring payment of a bonus because the Court cannot enforce a promise that is uncertain and indefinite.

Dr. Collins suggests that the April 8, 1974 letter from Dr. Nickey on behalf of APL establishes the Plaintiff's right to a bonus, but the Court finds this argument unpersuasive. The letter does state, "... [Y]ou would share in any bonus equally with other employees," and, "Save this letter for contract structuring purposes later." However, this letter was written in 1974, and when Dr. Collins signed his employment contract of 1977, he agreed that his compensation would consist of a "basic salary *with or without* supplementation by way of bonuses" (emphasis added). He also agreed that the written employment contract was the entire agreement between himself and APL and superseded any and all other agreements, whether oral or written. If Dr. Collins believed that the letter from Dr. Nickey established an enforceable right to a yearly bonus, then he should have brought that up prior to signing the 1977 agreement, which clearly allows the board of directors to set bonuses. The contract is clear and understandable, and Dr. Collins cannot now be heard to complain that he agreed in 1977 to something less than what he really wanted or expected.

Dr. Collins has not presented this Court with any evidence that would create a genuine issue of material fact with regard to the payment of a bonus under the terms of the contract in effect between APL and Dr. Collins in 1980 and 1981. Consequently, the Court orders that summary judgment is granted for the Defendants on Count VII of the complaint.

## MISREPRESENTATION BY THE INDIVIDUAL DEFENDANTS

In Count VIII, the Plaintiff alleges a claim against the individual Defendants for misrepresentation by word or deed during his recruitment, which led him to leave his position as director of laboratories at Community Hospital of Brooklyn, New York, and join APL as a pathologist for St. John's Hospital in Springfield, Illinois. Dr. Collins alleges in particular that the Defendants represented to Dr. Collins that he would share equally as a partner in all income through pension, profit sharing, and other benefit plans. During the years 1974 through 1979, the Defendants continued to represent to him that he would share equally in all the income, revenue, and benefits of APL. In 1980 and 1981, however, APL refused to pay Dr. Collins a bonus, and he argues that because of the misrepresentations made by the Defendants, they should be estopped from withholding from Dr. Collins his equal share of all income and revenue of APL for the fiscal years 1980 and 1981.

The factual allegations in this claim vary somewhat from the breach of contract claim in Count VII, but the analysis which the Court must use is similar. Dr. Collins is alleging that the representations made by the individual Defendants caused him to

leave New York and pursue employment with APL. The representations also led him to believe that he would share equally in all profits and revenue, including bonus awards, during his years with APL. However, the complaint contains no allegation that Dr. Collins was, in fact, damaged by his decision to leave New York and obtain employment with APL, other than his subsequent loss of bonuses in 1980 and 1981. Therefore, the Court reads Count VIII as requesting damages only for the bonuses to which Dr. Collins feels he is entitled, and it does not involve any claim that he suffered injury because he gave up one employment opportunity for another.

As this Court explained in ruling on Count VII of the complaint, prior to beginning his work with APL, Dr. Collins entered into an employment contract in 1974, which led to a subsequent contract in 1977. That contract provided for compensation to consist of a "basic salary with or without supplementation by way of bonuses." The contract also contained a provision that the employment contract would supersede any and all other agreements, either oral or written, and would constitute the entire agreement between the employee, Dr. Collins, and the employer, APL. There are no allegations and there is no evidence presented that when Dr. Collins signed this agreement, he was signing with the understanding that the words in the contract did not mean what they said because of the alleged representations made by the individual Defendants. In light of the contractual language which clearly establishes that the award of bonuses is up to the board of directors of APL, the Court finds that Dr. Collins has failed to raise a genuine issue of material fact with regard to his claim for the unpaid bonuses of 1980 and 1981 resulting from the misrepresentations of the individual Defendants. The Court orders that summary judgment is granted in favor of the Defendants on Count VIII of the complaint.

### WRONGFUL REMOVAL OR REDUCTION OF STAFF PRIVILEGES

In Count IX, the Plaintiff alleges that the Defendant St. John's Hospital unlawfully removed or reduced his staff privileges in violation of the by-laws of the Hospital. The Plaintiff argues that the Defendant Hospital did not comply with the by-laws of the Hospital when they substantially removed or reduced Dr. Collins' staff privileges in pathology by preventing him from practicing pathology in the pathology laboratory. The Defendant, on the other hand, points out that Dr. Collins was not entitled to any type of procedure regarding his staff privileges, because the Hospital never removed or reduced the Plaintiff's staff privileges. Rather, the Defendant argues that the evidence shows that Dr. Collins continues to retain his staff privileges at St. John's Hospital, even though those privileges are maintained on a leave of absence status.

Although this is a rather technical argument, the Court believes as a matter of law that the Defendants are correct in asserting that the Hospital has not reduced or removed Dr. Collins' staff privileges. A hospital requires that a physician have staff privileges at its facility as a means of insuring that a doctor is qualified to practice in his profession and that the hospital will fulfill its public service function of delivering quality medical services to its patients. Dr. Collins was not entitled to be employed by the Hospital simply because the Hospital had granted him staff privileges, even if the Hospital would not have employed him had he not had staff privileges. A hospital's decision to grant or deny staff privileges is based upon the qualifications of the physician, and a hospital is not required to employ everyone to whom it has granted staff privileges.

In the present case, Dr. Collins is asserting that because St. John's Hospital had granted him staff privileges, he was entitled to practice pathology in the Hospital's pathology laboratory, using the Hospital's laboratory equipment. However, St. John's Hospital declined to hire Dr. Collins because they already had a contractual arrangement with APL for the provision of all of their pathology services. The Hospital never made an issue out of Dr. Collins' qualification to practice pathology, which would have been the real issue at a hearing involving the reduction or removal of his staff privileges. Dr. Collins maintains his staff privileges at St. John's Hospital at

the current time under a leave of absence status; because the Hospital never reduced or removed his staff privileges, there was no issue or dispute about his qualifications which a hearing and other procedures in the by-laws could have addressed. It is true that Dr. Collins has been refused employment by St. John's Hospital, but this is due to the contract between the Hospital and APL and cannot be characterized as a reduction or removal of staff privileges which would require the procedural protections written into the Hospital's by-laws. The Court orders summary judgment in favor of the Defendants on Count IX.

TORTIOUS INTERFERENCE WITH STAFF PRIVILEGES

█ Count X of the complaint is similar to Count IX but is aimed at the individual Defendants and APL for allegedly inducing St. John's Hospital to remove or reduce Dr. Collins' staff privileges in pathology and to exclude Dr. Collins from practicing pathology at the Hospital in violation of the St. John's by-laws. The foregoing analysis of the arrangement between APL and St. John's Hospital makes it clear that this count, too, must fall on the Defendants' Motion for Summary Judgment.

The Court has already determined as a matter of law that St. John's Hospital did not reduce or remove Dr. Collins' staff privileges when they refused to allow him to practice pathology after he had resigned from APL. Because there was no reduction or interference with staff privileges, it follows that the other Defendants cannot be liable for inducing a reduction or interference.

█ Moreover, the Court has already upheld the legality of the contractual arrangement between APL and St. John's Hospital against the Plaintiff's claims that the arrangement violated federal and state antitrust laws. In implementing and enforcing this agreement, the Hospital decided not to hire Dr. Collins after his resignation from APL. Clearly, the effect of the agreement (at least as put into practice by the parties) was to deny Dr. Collins (as well as any other pathologists outside of APL) the opportunity to work for St. John's Hospital once he had resigned from APL. Be-

cause the Court has found that the agreement was legal and did not violate antitrust laws, the Plaintiff cannot argue that the parties to the agreement committed a tort by adhering to the terms of that agreement. The Court finds that even if the Defendants had caused St. John's to comply with the agreement by not hiring Dr. Collins, such action was taken pursuant to a lawful agreement and cannot form the basis for Dr. Collins' Count X claim that APL and the individual Defendants interfered with Dr. Collins' staff privileges because he was refused future employment at the Hospital. The Court finds in favor of the Defendants on their Motion for Summary Judgment with regard to Count X of the complaint.

CONCLUSION

Based upon the foregoing analysis, the Court finds that the Plaintiff has not raised a genuine issue of material fact with regard to any of his claims in the complaint. The Court orders that the Defendants' Motions for Summary Judgment are GRANTED. The Clerk is directed to enter summary judgment in favor of the Defendants on all counts of the Complaint.