**James G.P. COLLINS,
Plaintiff–Appellant,**

**v.**

**ASSOCIATED PATHOLOGISTS, LTD.,
et al., Defendants–Appellees.**

**No. 87–1399.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 27, 1987.

Decided April 20, 1988.

Peter B. Freeman, Hopkins & Sutter, Chicago, Ill., for plaintiff-appellant.

Susan M. Hickman, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Hugh J. Graham, III, Graham & Graham, Springfield, Ill., for defendants-appellees.

Before CUMMINGS, COFFEY and EASTERBROOK, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff Dr. James G.P. Collins, a pathologist, is currently employed and practicing his specialty in San Leandro, California. Dr. Collins claims that he was forced to accept his current position after antitrust violations deprived him of his former position at St. John's Hospital in Springfield, Illinois.[1] More specifically, in a ten-count amended complaint Dr. Collins alleged that the contractual arrangement between St.

---

1. Dr. Collins is not unique in turning to antitrust laws for relief. Yet despite the growing frequency with which doctors file antitrust claims, they have had little success. See Enders, *Federal Antitrust Issues Involved in the Denial of Medical Staff Privileges,* 17 Loy.U.Chi.L.J. 331 (1986).

John's and Associated Pathologists, Ltd. ("APL"), the group providing pathology services to the hospital, was a combination in restraint of trade, an unlawful boycott, and an unlawful tying agreement. Dr. Collins also accused APL of monopolization, attempted monopolization and conspiracy to monopolize the provision of pathology services. Finally, Dr. Collins' pendent state claims alleged violations of state antitrust law, breach of contract, misrepresentation, wrongful removal or reduction in staff privileges and tortious interference with staff privileges. Defendants St. John's Hospital and APL[2] filed motions for summary judgment. In a thorough opinion, Judge Mihm painstakingly examined the voluminous discovery material filed in this case and concluded that Dr. Collins failed to raise a genuine issue of material fact with regard to any of his claims. 676 F.Supp. 1388, 1411 (C.D.Ill.1987). Accordingly, the court granted the defendants' motions for summary judgment. We affirm on all counts that are still pressed.[3]

## I

From October 1974 through January 31, 1982, when the directors of APL asked for and received Dr. Collins' resignation, Dr. Collins was an employee and, for most of that period, a shareholder of APL. Throughout the period in which he was employed by APL, Dr. Collins worked under contracts between APL and St. John's as a pathologist at St. John's. The contracts between APL and St. John's required APL to provide complete and adequate pathology services to St. John's. APL's contractual obligation to provide pathology services included engaging the staff necessary to provide "full and complete professional service for the department."

Following his forced resignation from APL in January 1982, Dr. Collins sought to continue his employment at St. John's as an independent pathologist, separate from the APL contract. Although St. John's did not remove or reduce Dr. Collins' staff privileges, it refused to employ him as a pathologist. This refusal and the contractual relationships surrounding it provide the bases for Dr. Collins' claims.

## II

■ Dr. Collins begins his argument by challenging the standard for summary judgment employed by the district court. He cites *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), for the proposition that courts should hesitate before granting summary judgment in complex antitrust litigation. His argument ignores cases in this Circuit limiting *Poller* and noting that the very nature of antitrust litigation encourages summary disposition of such cases when permissible, see *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir.1984), certiorari denied, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985); *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549 (7th Cir.1980); *Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163, 1166 (7th Cir.1978), certiorari denied, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979), as well as the recent trilogy of cases in which the Supreme Court made clear that, contrary to the emphasis of some prior precedent, the use of summary judgment is not only permitted but encouraged in certain circumstances, including antitrust cases, *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric*

**2.** Collins filed suit against APL, the corporation, as well as the four pathologists employed by the corporation, each of whom was sued individually. The estate of a fifth individual pathologist was named as a defendant in Collins' second amended complaint. However, as Jessie Fulcher, executrix of the estate of the fifth pathologist, Dr. J. Herschel Fulcher, Jr., is not listed by the plaintiff's or the other defendants' brief as an appellee and has not filed a brief in this

Court, the estate appears to have been dropped as a defendant.

**3.** Count VII, breach of contract, and Count VIII, misrepresentation, have evidently been abandoned. Plaintiff's briefs and oral argument do not fault the district court's disposition of those counts. See 676 F.Supp. at 1408–1410.

*Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); see generally Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court*, 116 F.R.D. 183 (1987).

The first of the trilogy cases, *Matsushita*, is especially instructive because it involved the grant of a summary judgment motion in complex antitrust litigation. The plaintiffs in that case, Zenith and National Union Electric Corporation, filed suit alleging that 21 corporations, Japanese manufacturers of consumer electronic products and their American subsidiaries that sold the products in this country, had illegally conspired to drive American firms from the market through a concerted predatory pricing scheme. The district court found that any inference of conspiracy was unreasonable because (1) some portions of the evidence suggested that defendants conspired in ways that did not injure plaintiffs, and (2) the evidence that bore directly on the price-cutting conspiracy did not rebut the more plausible inference that petitioners were cutting prices to compete in the American market, not to monopolize it. The court then granted summary judgment in favor of all defendants on all counts.

The Court of Appeals for the Third Circuit reversed. It concluded that a reasonable factfinder could find a conspiracy. Commenting on the Third Circuit's opinion, the Supreme Court noted that the circuit court had not considered if it was as plausible to conclude that defendants' price-cutting behavior was independent as it was to conclude that it was conspiratorial. The Supreme Court reversed and remanded, ordering that the summary judgment be reinstated unless the Third Circuit could find some other evidence in the record that excluded the possibility that defendants underpriced plaintiffs to compete for business rather than to implement an economically senseless conspiracy. *Id.* 475 U.S. at 597–598, 106 S.Ct. at 1362.

In reversing the circuit court the Supreme Court relied on a seemingly new evidentiary standard for summary judgments. The Court restated the language of Fed.Rule Civ.Proc. 56(e) requiring the non-moving party to establish that there is a genuine issue of material fact, but the Court redefined "genuine." *Id.* at 586–587, 106 S.Ct. at 1356. It stated: "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* This means that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* This language indicates that a summary judgment motion is like a trial motion for a directed verdict and that "genuine" allows some quantitative determination of the sufficiency of the evidence. The trial court still cannot resolve factual disputes that could go to a jury at trial, but weak factual claims can be weeded out through summary judgment motions. The existence of a triable issue is no longer sufficient to survive a motion for summary judgment. *Id.* at 587, 106 S.Ct. at 1356. Instead, the triable issue must be evaluated in its factual context, which suggests that the test for summary judgment is whether sufficient evidence exists in the pre-trial record to allow the non-moving party to survive a motion for directed verdict. See Childress, 116 F.R.D. at 186.

Further, the Supreme Court seems to require lower courts to engage in a qualitative review of the claim that goes beyond a minimum quantitative sufficiency of the evidence type of review. "It follows from these settled principles that if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. "[T]he absence of any plausible motive to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists. Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with

other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Id.* at 596–597, 106 S.Ct. at 1361. *Matsushita*, not *Poller*, is now the applicable standard and the district court in this case applied it correctly.

### III

In Count III of his amended complaint, Dr. Collins asserts that the series of consecutive contracts between APL and St. John's created and maintained an illegal tying arrangement in violation of Section 1 of the Sherman Act. Each of the three contracts required APL to provide complete and adequate pathology services to St. John's. St. John's then included the pathology services provided by APL in the package St. John's presented to its patients. This package included the full range of facilities and services necessary for the patients' treatment and maintenance in the hospital. As a result of this arrangement, patients who required pathology services purchased those provided for in the package—the services of APL.

Dr. Collins contends that this arrangement constitutes illegal tying. However, a tying arrangement demands by definition two separate products—a tying product and a tied product. In an attempt to satisfy this requisite, Dr. Collins argues that the tied product consists of the hospital facilities and services provided to patients at St. John's and that the tying product consists of the pathology services provided by the individual defendants.

■ Whether hospital services and pathology services are, as Dr. Collins asserts, two separate products "turns not on the functional relationship between them, but rather *on the character of the demand for the two items."* *Collins,* 676 F.Supp. at 1402 (emphasis in original) (quoting *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 19, 104 S.Ct. 1551, 1562, 80 L.Ed.2d 2). Therefore, in this case no tying arrangement can exist unless there is a distinct demand for the purchase of pathological services by hospital patients separate from the demand for the hospital facilities and services provided by St. John's;

and further, this demand must be sufficient to identify a distinct product market in which it is efficient to offer pathological services separately from hospital services. See *Jefferson Parish,* 466 U.S. at 22–23, 104 S.Ct. at 1563–1564.

An indicator of whether a separate demand exists for a product is whether consumers make specific requests. In *Jefferson Parish,* the plaintiff anesthesiologist supported his tying claim with "ample and uncontroverted testimony that patients or surgeons often request specific anesthesiologists to come to a hospital to provide anesthesia, and that the choice of an individual anesthesiologist separate from the choice of a hospital is particularly frequent in respondent's specialty, obstetric anesthesiology." *Jeffersoni Parish,* 466 U.S. at 22, 104 S.Ct. at 1564. In contrast, the evidence presented in this case is overwhelming that patients never request and physicians rarely request specific pathologists. The evidence presented here also established that pathology is a laboratory-based specialty, so that the pathologist, unlike the anesthesiologist, has no face-to-face contact with the patient and the treating physician. Clearly, the relationship between hospitals and pathologists differs from that of hospitals and anesthesiologists. See *id.* at 23 n. 36, 104 S.Ct. at 1564 n. 36 (specifically recognizing that "anesthesiologists may differ from radiologists, pathologists and other types of hospital-based physicians").

Contrary to the finding of the Supreme Court in *Jefferson Parish* that "the record amply supports the conclusion that consumers differentiate between anesthesiological services and other hospital services provided by [the defendant hospital]," *id.* at 23, 104 S.Ct. at 1564, the district court in Dr. Collins' case found that pathology services are just one of the many services provided by the hospital for its patients. As such, no separate demand exists for pathological services that is sufficient to create a separate market. 676 F.Supp. at 1403; see also, *Drs. Steuer and Latham v. National Medical Enterprises, Inc.,* 672 F.Supp. 1489, 1506–1508 (D.S.C.1987) (in

which the record contained uncontroverted evidence consistent with and supportive of the reasoning of the district court herein that pathology services are not a product separate from hospital services). Because pathology services are not a separate and distinct product from hospital services, they combine in the form of one product, not two tied products. Without two products, the alleged tying arrangement is impossible.

## IV

■ Dr. Collins also argues that the agreements entered into between St. John's and APL are exclusive contracts that constitute unreasonable restraints of trade in violation of Section 1 of the Sherman Act. Whether the agreements were indeed exclusive is a disputed factual issue, but the district court nevertheless granted summary judgment in favor of the defendants because it held that "the agreements are not an unreasonable restraint of trade even if they operate as exclusive contracts." *Collins*, 676 F.Supp. at 1394. We affirm the grant of summary judgment.

Not all exclusive contracts violate the Sherman Act. Whether a particular contract does so depends on the effect that contract has upon competition in the relevant market place. *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961).[4] The controlling factor in this determination is the relevant market area. *Id.* at 329, 81 S.Ct. at 629. Thus we must determine the relevant market, which in this case first requires clarification of the relevant product.

The relevant product here is pathologists, not pathology services, and the corresponding relevant market is the market in which pathologists compete for jobs, not the market in which hospitals compete in offering pathology services to patients.

This conclusion is reached both by application of our earlier holding that no market exists for pathology services separate from hospital services and by an analysis of the exclusive dealing claim under the provisions of *Tampa Electric*.

First, as we held earlier, from the perspective of consumers of medical services, the patients in St. John's, there is no distinct demand for and thus no market for pathological services. See *supra* at 477–478. Therefore the contract between St. John's and APL for the provision of pathological services could not have had an impact on patients. The only segment possibly affected by the contract is that of providers of pathological services, namely, hospitals and clinical laboratories. Therefore the exclusive contract affects where pathologists can be employed and the relevant market is the market in which pathologists compete for jobs.

The same conclusion results from an analysis of the exclusive dealing claim alone and begins with *Tampa Electric*. The exclusive contract at issue there was a protracted requirements contract between a public utility, Tampa Electric Co., and a coal company. In its determination of whether the contract was an unreasonable restraint of trade that foreclosed competition, the Court did not consider any impact the contract might have on the consumers who purchased the resultant electricity. Instead, the Court focused on potential competitors of the party to the contract with Tampa Electric, other coal companies. The Court looked to the other coal companies that could have supplied Tampa Electric and concluded that the relevant market area was the area in which these coal companies competed. *Id.* at 330–333, 81 S.Ct. at 629–631.

As the district court noted, in the present case, St. John's is in the position of Tampa Electric and APL is in the position of the

---

**4.** Although *Tampa Electric* was brought under Section 3 of the Clayton Act, courts routinely rely on its analysis for cases arising under Sections 1 and 2 of the Sherman Act. Since the proscription of Section 3 of the Clayton Act is broader than that of Sections 1 and 2 of the Sherman Act, if a contract does not fall within the relevant market coverage of the Clayton Act it is not forbidden by the Sherman Act. In addition, while Section 3 of the Clayton Act does not apply to services, *Chelson v. Oregonian Pub. Co.*, 715 F.2d 1368, 1372 (9th Cir.1983), reference is still appropriate for the analogous "relevant market" jurisprudence thereunder.

supplying coal company. 676 F.Supp. at 1395. In determining whether this exclusive arrangement forecloses competition, the focus is upon competition between pathologists for the right to practice at St. John's. So the contract must be viewed in light of its effect on pathologists competing for work, not from the effect on patients at St. John's whose options are limited.

Thus the market that must be determined is that in which pathologists compete for jobs. This market is not necessarily the same as the market in which hospitals compete in offering the services procured by the contract to patients, see *Jefferson Parish*, 466 U.S. at 29, 104 S.Ct. at 1567, and in this case it is not the same. The district court found that Dr. Collins failed to show that the market hospitals look to in hiring pathologists is anything but nationwide. 676 F.Supp. at 1405. The only evidence in the record regarding the scope of the market is that a nationwide market exists for hospitals to hire pathologists. Dr. Collins' own experience demonstrates the coast-to-coast market. He practiced in Brooklyn, New York, before joining APL and practicing at St. John's in Springfield, Illinois. When he left Springfield, he found work in San Leandro, California. Most of the other pathologists employed by APL during the years in question were also from out of state, as are most of the pathologists employed by Dr. Collins' current employer, Humana Hospital. Dr. Collins' deposition testimony also admits the national scope of the market, reflected in the national listings of both pathologists and hospitals in the College of American Pathologists' placement service list and in the advertisements in the *New England Journal of Medicine*, a national publication.

The district court held that because the market is nationwide, even if the contract between APL and St. John's excluded Dr. Collins from the local Springfield market, a substantial number of other opportunities were available to him (and other pathologists) for practicing pathology and thus no genuine issue of material fact was in dispute regarding the effect of the agreement on competition. We agree.

V

In his memorandum in response to the Defendants' Motions for Summary Judgment, Dr. Collins argued that the exclusive agreement between St. John's and APL constitutes an illegal boycott in violation of Section 1 of the Sherman Act. Although an illegal boycott is not specifically alleged in Dr. Collins' amended complaint, the district court found that the broad language of Count I, alleging that the defendants engaged in a combination in restraint of trade, encompassed the idea of an illegal boycott and allowed the theory to be read into the complaint. The court, however, rejected Dr. Collins' assertion of a *per se* standard and under a rule of reason analysis granted summary judgment in favor of the defendants.

On appeal, Dr. Collins challenges the district court's analysis of several recent decisions by this Court applying the rule of reason in boycott cases. This challenge is meritless. The district court thoroughly and correctly applied the rule of this Circuit to ·the facts of Dr. Collins' case.

■ In *Marrese v. American Academy of Orthopaedic Surgeons*, 726 F.2d 1150, 1155 (7th Cir.1984) (*en banc*), reversed on other grounds, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985), we stated, "in this circuit at least 'boycotts are illegal per se only if used to enforce agreements that are themselves illegal per se—for example price fixing agreements'" (quoting an earlier panel opinion in that case, 706 F.2d 1488, 1495 (7th Cir.1983)). See also *Wilk v. American Medical Ass'n*, 719 F.2d 207, 221 (7th Cir.1983); *United States Trotting Ass'n v. Chicago Downs Ass'n*, 665 F.2d 781, 787–790 (7th Cir.1981) (*en banc*). Thus under the law of this Circuit, even if the individual members of APL combined in a horizontal group boycott to exclude Dr. Collins from practice at St. John's, the boycott would be illegal *per se* only if the agreement the individual members of APL combined to enforce was itself illegal *per se*.

If the individual members of APL did combine to persuade St. John's not to hire Dr. Collins as an independent pathologist, they did so to enforce their contract with St. John's under which it was agreed that APL would provide complete and adequate professional pathology services. This agreement did not violate Section 1 of the Sherman Act. See *supra* at 479. Because the agreement the alleged boycott was used to enforce was not illegal, much less illegal *per se*, the district court correctly applied the rule of reason as the applicable standard.

## VI

■ Dr. Collins' final federal antitrust claim is against APL and the individual defendants for attempted monopolization and abuse of monopoly power. In his appellate brief Dr. Collins accuses the district court of ignoring both his evidence and his claim. Neither is true. What the district court did was rely on its earlier tying analysis in a manner that prevented anomalous holdings.

Dr. Collins argued that the relevant geographic market that APL monopolized or attempted to monopolize was the market for pathological services at St. John's hospital. Accepting the relevant market proposed by Dr. Collins,[5] the allegations of monopolization had to fail. In analyzing Dr. Collins' tying argument the court held as a matter of law that there is no distinct product market consisting of providing pathological services to individual patients of St. John's. It is impossible to monopolize a market that does not exist.

The district court also held that Dr. Collins could not state a claim against the APL defendants for monopolization or attempted monopolization of a broader market, the Springfield Metropolitan Statistical Area ("SMSA"), for pathological services without including St. John's hospital as a defendant. The allegations in Dr. Collins'

brief before this Court admit as much: "[t]hrough its exclusive access to the dominant hospital [St. John's] in the SMSA, APL has enjoyed an increasing share of the market for pathology services in the SMSA" (Br. 14). Dr. Collins cannot bring a claim of monopolization or attempted monopolization against the APL defendants without showing some type of effort at illegal monopolization on the part of St. John's hospital as well. Dr. Collins has made no such showing. The district court properly granted the defendants' motions for summary judgment regarding the monopolization claims.

## VII

In addition to his federal antitrust claims, Dr. Collins claims violations of three sections of the Illinois Antitrust Act that parallel his Sherman Act counts. Ill. Rev.Stat. ch. 38, §§ 60–3(2), 60–3(3) and 60–3(4). The language of Section 60–3(2) closely tracks the language of Section 1 of the Sherman Act and the language of Section 60–3(3) is very similar to the language of Section 2 of the Sherman Act. Based upon these similarities, summary judgment was appropriate as to the counts based on Sections 60–3(2) and 60–3(3) for the reasons stated with respect to the parallel Sherman Act counts.

Although the result under Dr. Collins' third Illinois Antitrust Act claim under Section 60–3(4) is the same, the analysis is somewhat complicated by the holding of an Illinois Supreme Court case that antedates *Jefferson Parish, People v. Schwulst Building Center, Inc.*, 89 Ill.2d 365, 59 Ill.Dec. 911, 432 N.E.2d 855 (1982). In *Schwulst Building* the Supreme Court of Illinois recognized that Section 60–3(4) is patterned after Section 3 of the Clayton Act. *Id.* at 374, 59 Ill.Dec. at 916, 432 N.E.2d at 860. It also noted that under Section 60–11 the Illinois section should be construed consistently with federal law.

---

**5.** The district court noted, and we agree, that Dr. Collins is slicing the geographic market much too thin in limiting the relevant market for pathology services to St. John's hospital. 676 F.Supp. at 1405. As we stated in *Dos Santos*

*v. Columbus–Cuneo–Cabrini Medical Center*, 684 F.2d 1346, 1353 (7th Cir.1982), "we have reason to doubt whether the relevant market can be sliced so small as to embrace only a single hospital."

*Id.*[6] Thus the court in *Schwulst Building* felt bound to follow what it perceived the then existing federal law to be—the application of a *per se* test to exclusive dealing and tying arrangements. *Id.* (citing *Standard Oil Co. v. United States*, 337 U.S. 293, 304–305, 69 S.Ct. 1051, 1057–1058, 93 L.Ed. 1371 ("*Standard Stations*"); *International Salt Co. v. United States*, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20).

Since the decision in *Schwulst Building,* the federal law that the Illinois courts are bound to follow in applying the Illinois Antitrust Act has changed. Recently we examined *Standard Stations*, the case on which *Schwulst Building* relied, and determined that "it now appears most unlikely that such agreements, whether challenged under section 3 of the Clayton Act or section 1 of the Sherman Act, will be judged by the simple and strict test of *Standard Stations*. They will be judged under the Rule of Reason, and thus condemned only if found to restrain trade unreasonably." *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 393 (7th Cir.1984) (citing *Jefferson Parish*, 466 U.S. at 45–46, 104 S.Ct. at 1575–1576 (concurring opinion)).

In light of the recent developments in federal antitrust law, the district court did not believe it was bound to apply the literal holding of *Schwulst Building* that Section 60–3(4) involves a *per se* analysis. 676 F.Supp. at 1407. We agree. Therefore, for the reasons stated regarding the parallel federal claim, the district court appropriately granted summary judgment.

## VIII

Dr. Collins also asserts that St. John's wrongfully removed or reduced his staff privileges in violation of the by-laws of the hospital. However, the record reflects that St. John's has neither removed nor reduced Dr. Collins' staff privileges. In May 1982, Dr. Collins was, on his own request, placed on leave of absence, but he retains full staff privileges to this day. Staff privi-

leges reflect the hospital's decision that a physician is qualified to practice in the facility, but do not in and of themselves confer employment. Employment as a pathologist at St. John's was determined by the legal contract between St. John's and APL. See *supra* at 477. Although without concurrent employment by St. John's as a pathologist these staff privileges may be of little or no value to Dr. Collins, the fact remains that the privileges were neither removed nor reduced. We affirm the grant of summary judgment.

## IX

■ Finally, Dr. Collins asserts that APL and the individual defendants tortiously interfered with his relationship with St. John's by inducing St. John's to remove or reduce his staff privileges and to exclude him from practicing at St. John's. As to the staff privileges assertion, we have already held that St. John's did not remove or reduce Dr. Collins' staff privileges. See *supra* at 481. APL and the individual defendants therefore cannot be liable for inducing a result that never occurred. As to any actions by APL or the individual defendants to exclude Dr. Collins from practicing at St. John's, we have already held that any such action was pursuant to a legal arrangement. See *supra* at 480. Such legal actions cannot form the basis for a tortious interference claim. Summary judgment was again appropriately granted.

We affirm the district court's judgment in all respects.

---

6. Section 60–11 of the Illinois Antitrust Act requires that "[w]hen the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act." 38 Ill.Rev. Stat. § 60–11.