IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 19, 2002 Session

## CITY OF COOKEVILLE, TENNESSEE, ET AL.
## v. WILLIAM M. HUMPHREY, M.D., ET AL.

Appeal from the Chancery Court for Putnam County
No. 99-219      Billy Joe White, Chancellor

No.  M2001-00695-COA-R3-CV - Filed November 20, 2002

This is a declaratory judgment action wherein a private act hospital authority, established pursuant to Tennessee Code Annotated sections 7-57-601 to 604, seeks a declaration that it has the authority to enter into an exclusive contract for professional radiology services, thus limiting the use of imaging equipment and hospital support staff situated in the hospital to such exclusive providers of radiology services.  Defendants are four competent radiologists, presently on the medical staff of the hospital, who have also established Premier Diagnostic Imaging Center, LLC to provide outpatient radiology services independent of the hospital.  The exclusive contract sought by the hospital would effectively "close" use of the hospital imaging facilities and support staff to all radiologists except the providers named in the exclusive contract.  The trial court declared that the hospital was authorized to enter into such an exclusive provider contract, and we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., and ROBERT L. JONES, SP. J., joined.

William H. West, Nashville, Tennessee and John Acuff, Cookeville, Tennessee, for the appellants, William M. Humphrey, M.D., John P. Limbacher, M.D., Daniel F. Coonce, M.D., George O. Mead, M.D., and Putnam Radiology, P.C.

Andree Sophia Blumstein, Nashville, Tennessee, for the appellees, City of Cookeville, Tennessee, by and through Cookeville Regional Medical Center, and Cookeville Regional Medical Center Authority.

William B. Hubbard, Nashville, Tennessee, for amicus curiae, Tennessee Hospital Association.
Andrew Yarnell Beatty, Nashville, Tennessee, for amicus curiae, Tennessee Medical Association.
David L. Steed, Nashville, Tennessee, for amicus curiae, Medical Staff of Cookeville Regional Medical Center.

**OPINION**

The facts necessary to a decision in this case were stipulated by the parties, and the case was submitted to the trial court on cross motions for summary judgment. The trial court granted the Motion for Summary Judgment filed by Plaintiff hospital, and Defendant radiologists appeal.

Cookeville Regional Medical Center ("CRMC") is a private act public hospital operated by the City of Cookeville, by and through Cookeville Regional Medical Center Authority ("CRMCA"). This hospital is established under the provisions of Tennessee Code Annotated sections 7-57-601 to 604. Defendants, Drs. Humphrey, Limbacher, Coonce, and Mead form a professional corporation known as Putnam Radiology, P.C. and are competent and qualified radiologists with staff membership and clinical privileges at CRMC. They practice at CRMC Imaging Department, which has historically operated as an open staff department without an exclusive provider contract.

Defendant radiologists, in early 1999, also formed a limited liability company, Premier Diagnostic Imaging Center, LCC, and applied for a Certificate of Need for an outpatient diagnostic center in which they intended to provide outpatient imaging services in competition with CRMC. The Certificate of Need was granted to Premier Diagnostic Imaging Center, LCC on April 28, 1999.

At a March 25, 1999 meeting, the CRMCA Board of Trustees decided to "close" the medical staff of the Imaging Department at CRMC by seeking an exclusive provider contract for in hospital imaging services. The result of such a contract would be that only radiologists employed by the exclusive provider under the contract would have access to and use of the imaging facilities and support staff at CRMC.

The medical staff of CRMC voted to support the Defendant radiologists and their professional corporation, Putnam Radiology, PC, in becoming the providers of radiology services under such an exclusive contract if an agreement could be reached on such a contract. On April 19, 1999, CRMC issued a request for a proposal from qualified radiology groups to operate and administer its Imaging Department under an exclusive contract. Putnam Radiology, PC objected to several provisions in the proposed exclusive contract including the "reasonable non-compete provisions" and a provision for termination of medical staff privileges immediately upon the termination of the radiology services contract. In the words of Dr. Humphrey: "It is our position that the medical staff bylaws of CRMC do not give the hospital the power to exclude radiologists on its staff from access to the devices and staff of the hospital."

An impasse having thus been reached as to any exclusive services contract between CRMC and Putnam Radiology, PC, the exclusive provider contract proposal was put on hold, and the City of Cookeville, by and through CRMC and CRMCA, on July 1, 1999, filed this action for declaratory judgment seeking a declaration of the right to close the Imaging Department at CRMC by means of an exclusive provider contract. On July 29, 1999, the Defendants answered the Complaint and filed a Counterclaim asserting that the medical staff bylaws of CRMC had been violated by the actions of Plaintiff and that the decision to close the CRMC Imaging Department was done in retribution

-2-

against Defendants for their actions in obtaining a Certificate of Need for the establishment of an outpatient diagnostic imaging center in Cookeville.

The case was heard by Chancellor Billy Joe White on January 17, 2001 on cross motions for summary judgment filed by the parties. The Chancellor granted Plaintiffs' Motion for Summary Judgment by Order of February 12, 2001 holding:

> The Court finds that the Tennessee Private Act Hospital Authority Act of 1996, Tenn. Code Ann. § 7-57-601 *et seq.*, gives the Plaintiff Cookeville Regional Medical Center Authority (the "Hospital") the authority to close a Hospital department for competitive and economic reasons through an exclusive contracting arrangement even though doing so will, in this case, incidentally affect the Defendants' staff privileges. The Hospital has the right to close the staff of its Imaging Department and to seek an exclusive provider of radiology services, and the Defendants' loss of their staff privileges necessarily follows. The Court finds that there is no issue concerning the competence of the Defendant radiologists and that, therefore, it would be meaningless to require the Hospital to provide a hearing regarding any adverse effect on privileges. The Court finds that the Plaintiffs' decision to close the Hospital's Imaging Department is a business decision.

> The Court further finds that: the Hospital's Medical Staff Bylaws, and specifically Section 14.1.D of the Medical Staff Bylaws, do not give the Medical Staff the right to veto a decision by the Hospital to close a previously open department; Section 14.1.D gives the Medical Staff only the right to make recommendations to the Hospital Board; there is no breach of the Medical Staff Bylaws; and there are no due process problems in connection with the Hospital's actions. Thus, the Hospital may close its Imaging Department without violating the Defendants' contractual or due process rights.

The case was decided by the trial court with the Motion for Summary Judgment of Plaintiffs' being granted and the Motion for Summary Judgment of Defendants' being denied. The Defendants filed a timely appeal.

An appeal from a grant of summary judgment brings the case before the appellate courts on questions of law only, subject to *de novo* review accompanied by no presumption of correctness of the disposition made by the trial court. *Gonzales v. Alman Constr. Co.*, 857 S.W.2d 42 (Tenn. Ct. App. 1993). The burden rests upon the party seeking summary judgment to persuade the court that no genuine and material factual issues exist and that the movant is entitled to judgment as a matter of law. *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993). In ruling on a motion for summary judgment, both the trial court and the Court of Appeals must look to all of the evidence, take the strongest legitimate view of the evidence in favor of the opponent of the motion and allow all reasonable inferences in his favor, discarding all countervailing evidence. After having done so, if there is any dispute as to any material determinative evidence or any doubt as to the conclusion to be drawn from

the whole evidence, the motion must be denied. *Dooley v. Everett*, 805 S.W.2d 380 (Tenn. Ct. App. 1990); *Evco Corp. v. Ross*, 528 S.W.2d 20 (Tenn. 1975). In this case, the facts are essentially stipulated such that only questions of law are before the Court, and these questions were correctly determined on summary judgment motion. *Allstate Ins. Co. v. Jordan*, 16 S.W.3d 777 (Tenn. Ct. App. 1999).

Two issues control the case on appeal:

1. Do Plaintiffs/Appellees have the right to "close" the Imaging Department at CRMC by means of an exclusive provider contract and thereby preclude Defendants/Appellants' use of CRMC imaging facilities and support staff?

2. If such closing is authorized, does the resulting non-access to CRMC imaging facilities and support staff violate the medical staff bylaws of CRMC and constitute breach of contract with Appellants?

As to the first issue, CRMC is a public hospital, as opposed to a private hospital, and Appellants rely upon the long standing rule in Tennessee that a licensed physician who complies with hospital rules and regulations has a right to practice medicine in the public hospitals of the State. *See Henderson v. City of Knoxville*, 9 S.W.2d 697, 698 (Tenn. 1928). The decisive question on this issue is whether or not the rule in *Henderson* and its progeny survived the enactment of Chapter 778 of the Public Acts of 1996, now codified as Tennessee Code Annotated sections 7-57-601 to 604. On November 25, 1998, the Attorney General provided the following opinion:

> QUESTION:
> Does Tennessee Code Annotated § 7-57-601, *et seq.*, authorize a public hospital to close its medical staff to licensed Tennessee physicians in good standing, thus overruling by legislation previous case law?
>
> OPINION:
> Yes. Tenn. Code Ann. § 7-57-603 extends the powers and rights of private act metropolitan hospitals to private act hospital authorities, otherwise known as public hospitals. Tenn. Code Ann. § 7-57-502 provides metropolitan hospitals with the authority to contract exclusively with physicians. Previous case law restricting the public hospitals' right to close a medical staff, therefore, has been nullified by this statutory extension of authority.
>
> OPINION BY:
> JOHN KNOX WALKUP, Attorney General and Reporter; MICHAEL E. MOORE, Solicitor General; VICKIE P. HALL, Assistant Attorney General.
>
> OPINION ANALYSIS:
> The Private Act Hospital Authority Act (the "Act"), Tenn. Code Ann. § 7-57-601, *et seq.*, was adopted in 1996 to extend the powers of the metropolitan hospital

authorities to the private act hospitals. Tenn. Code Ann. § 7-57-603 states in part that:

> "A private act hospital authority, . . . has as supplemental and additional rights and powers, all powers granted to private act metropolitan hospital authorities in title 7, chapter 57, part 5. . . ."

Tenn. Code Ann. § 7-57-502(c) states in part that a hospital authority, in the exercise of its powers, may:

> ". . . contract for or otherwise participate solely or with others in the ownership or operation of a hospital, medical or health program properties and facilities and properties, facilities, and programs supporting or relating thereto of any kind and nature whatsoever and in any form of ownership whenever the board of trustees in its discretion shall determine it is consistent with the purposes and policies of this part or any private act applicable to it, and may exercise such powers regardless of the competitive consequences thereof."

Based on the language of that statute, a public hospital may contract with others in furtherance of the hospital's operation regardless of the competitive consequences of that contract. Certainly physicians and surgeons are an integral part of the operation of any hospital. It, therefore, follows that hospitals may contract with a particular physician or physician group exclusively even if it is to the disadvantage of other similarly qualified physicians or groups.

The purpose and policy for the enactment of Tenn. Code Ann. § 7-57-501, *et seq.*, is stated in part as follows:

> "The general assembly hereby finds that the demand for hospital, medical and health care services is rapidly changing as is the way and manner in which such services are purchased and delivered; that the market for hospital and health care services is becoming increasingly competitive; and that the hospital and other health care providers need flexibility to be able to respond to changing conditions by having the power to develop efficient and cost-effective methods to provide for hospital, medical and health care needs. The general assembly finds that public hospitals in metropolitan areas are presently at a competitive disadvantage, and that significant investments in the public assets of private act metropolitan hospital authorities could be jeopardized by inability to compete with private hospitals because of legal constraints upon the scope of their

operations and limitations upon the power granted to public hospitals under existing law."

If there is any question as to the specific language in Tenn. Code Ann. § 7-57-502(c), clearly, the legislative intent for the enactment of the statute, and the subsequent enactment of the Act, is to enable public hospitals to compete in the health care market. "It is generally held that private hospitals have the right to exclude licensed physicians and surgeons from the use of the hospital for any cause deemed sufficient by its managing authorities." *Nashville Memorial Hospital, Inc., et al. v. Binkley*, 534 S.W.2d 318 (Tenn. 1976). It follows then that the power to "contact for or otherwise participate solely or with others in the . . . operation of a hospital . . ." is intended to give public hospitals the same right to exclusively contract with physicians or surgeons, regardless of the affect on the excluded physicians. Tenn. Code Ann. § 7-57-502.

The result of the Act, therefore, is to nullify court decisions under prior law which held that a licensed physician who complies with hospital rules and regulations has a right to practice medicine in the state's public hospitals. *Henderson v. City of Knoxville, et al.*, 9 S.W.2d 697 (Tenn. 1928).

Although the statute in question does not prohibit the specific action by a public hospital set out in this opinion request, this Opinion does not address, and should not be construed to address, other provisions of federal and state law governing competitive activity. Specifically, this Office has not reviewed and takes no position on the activity in question under applicable provisions of the Sherman Act, 15 U.S.C. § 1 *et seq.*, the Clayton Act, 15 U.S.C. § 12 *et seq.*, or any other federal law. Finally, this opinion is not intended to analyze any other actions by private act or metropolitan hospital authorities that might conflict with Article I, Section 22 of the Tennessee Constitution or with Tenn. Code Ann. § 47-25-101, *et seq.*

Op. Att'y Gen. 98-223 (1998).

After careful consideration, we find that we cannot improve on the reasoning of the Attorney General, and we, therefore, adopt the opinion of the Attorney General as the opinion of the Court. The Plaintiffs are empowered to close the Imaging Department of CRMC by means of an exclusive provider contract and *Henderson v. City of Knoxville* and its progeny have been legislatively overruled by sections 7-57-601 to 604 of the Code.

Turning now to the second issue, Appellants assert that "closing" the Imaging Department of CRMC to qualified radiologists who are members of the medical staff of the hospital constitutes a breach of the contract between the hospital and the affected radiologists. Relying on the near universal rule in *Lewisburg Community Hospital v. Alfredson*, 805 S.W.2d 756 (Tenn. 1991), that

hospital bylaws and medical staff bylaws are an integral part of the contract between the hospital and its medical staff members, Appellants point to certain provisions of these bylaws.

### ARTICLE III: STAFF MEMBERSHIP

3.1   NATURE OF STAFF MEMBERSHIP

Membership on the medical staff of Cookeville General Hospital is a privilege which shall be extended only to professionally competent physicians, dentists and podiatrists who continuously meet the qualifications, standards and requirements set forth in these bylaws. Appointment to and membership on the staff shall confer on the staff member only such clinical privileges and prerogatives as have been granted by the board in accordance with these bylaws, and shall include staff category, and department assignments.

. . . .

3.2-3   Nondiscrimination
Staff membership or particular clinical privileges shall not be denied on the basis of any criterion unrelated to the efficient delivery of patient care at the generally recognized professional level of quality in the hospital, including, but not limited to, sex, race, creed, religious beliefs and national origin or to an otherwise qualified handicapped practitioner.

. . . .

### ARTICLE XIV: GENERAL PROVISIONS

14.1 MEDICAL STAFF RULES & REGULATIONS

. . . .

D.   Medical Staff Role in Exclusive Contracting: The Medical Staff, through the Medical Executive Committee, with medical staff approval, shall review and make recommendations to the Board regarding issues related to the exclusive arrangements for physician and/or professional services, prior to any decision being made, in the following situations:
1. the decision to execute an exclusive contract in a previously open department or service;

-7-

2. the decision to renew or modify an exclusive contract in a particular department or service;

3. the decision to terminate an exclusive contract in a particular department or service.

. . . .

ARTICLE XVI:  FAIR HEARING PLAN

. . . .

16.1-1  INITIATION OF HEARING

16.1-1 Recommendations or Actions

The following recommendations or actions shall, if deemed adverse pursuant to Section 16.1-2, entitle the practitioner affected thereby to a hearing:

A.      Denial of initial staff appointment,
B.      Denial of reappointment,
C.      Suspension of staff appointment,
D.      Revocation of staff appointment,
E.      Denial of requested modification of staff category,
F.      Reduction in staff category,
G.      Limitation of admitting prerogatives,
H.      Denial of requested department assignment,
I.      Denial of requested clinical privileges,
J.      Reduction in clinical privileges,
K.      Suspension of clinical privileges,
L.      Revocation of clinical privileges,
M.      Terms of probation,
N.      Requirement of consultation,
                              AND/OR
O.      Letter of admonition or letter of reprimand.

The pivotal and decisive question involves the holding of the Supreme Court in *Alfredson*. While it is not open to legitimate dispute that the medical staff bylaws are an integral part of the contract between Appellants and Appellees, as *Alfredson* correctly holds, it is the effect of closure of the hospital Imaging Department on the contractual rights of Appellants that puts *Alfredson* at odds with every other jurisdiction that has addressed the issue.  In *Alfredson*, the Supreme Court held:

After the foregoing analysis, the Court of Appeals observed, and we agree, It is fair to conclude that the hospital granted Dr. Alfredson specific, delineated clinical privileges enabling him to practice radiology at the hospital. His contract required them. The bylaws themselves required that he seek them and likewise required the hospital to grant them. With such hospital-based specialties such as radiology, the inability to use the hospital facilities and staff would have rendered the clinical privileges meaningless. Thus, necessarily included with Dr. Alfredson's privileges was the right to use hospital facilities and staff.

. . . .

We, therefore, hold that the Hospital's refusal to give Dr. Alfredson access to its radiological equipment and staff after January 2, 1986, significantly reduced his privileges. It follows that Dr. Alfredson was entitled to a hearing under the medical staff bylaws, and that the Hospital breached its contract by failing to provide him a hearing. As a result, we affirm the Court of Appeals' holding that the Hospital was not entitled to a summary dismissal of Dr. Alfredson's claims arising from the Hospital's failure to follow its bylaws, and affirm its action vacating the Hospital's summary judgment in part. We reverse the Court of Appeals' decision that genuine factual issues exist concerning whether the Hospital significantly curtailed Dr. Alfredson's clinical privileges by denying him access to its radiological equipment and staff, and its resulting remand to the trial court.

Having determined that Dr. Alfredson's clinical privileges are sufficiently set out in the record for this purpose, we hold, as a matter of law, that his privileges were significantly reduced when the Hospital denied him access to its equipment and its staff. It follows that the medical staff bylaws required the Hospital to grant him a hearing when his clinical privileges were significantly reduced, and that by not doing so, the Hospital breached its contract.

*Alfredson*, 805 S.W.2d at 761-62.

Without mentioning *Alfredson*, the trial court held: "Thus, the Hospital may close its Imaging Department without violating the Defendant's contractual or due process rights." In so holding, the trial court followed the apparently universal rule applied in other jurisdictions, which rule is contra to *Alfredson*. *See Adler v. Montefiore Hosp. Ass'n of W.Pa.*, 311 A.2d 634 (Pa. 1973); *Anne Arundel Gen. Hosp. v. O'Brien*, 432 A.2d 483 (Md. 1981); *Engelstad v. Virginia Mun. Hosp.*, 718 F.2d 262 (8th Cir. 1983); *Collins v. Associated Pathologists, Ltd*, 844 F.2d 473 (7th Cir. 1988); *Holt v. Good Samaritan Hosp. & Health Ctr.*, 590 N.E.2d 1318 (Ohio 1990); *Bartley v. Eastern Maine Med. Ctr.*, 617 A.2d 1020 (Me.1992); *Dutta v. St. Francis Reg. Med. Ctr.*, 867 P.2d 1057 (Kan. 1994); *Gonzalez v. San Jacinto Methodist Hosp.*, 880 S.W.2d 436 (Tex. 1994); *Bryant v. Glen Oaks Med. Ctr.*, 650 N.E.2d 622 (Ill. App. Ct. 1995); *Garibaldi v. Applebaum*, 742 N.E.2d 279 (Ill. 2000); *Van Valkenburg v. Paracelsus Healthcare Corp.*, 606 N.W.2d 908 (N.D. 2000).

In addressing the effect on the constitutional and contractual rights of medical staff physicians effected by exclusive contract closure of the hospital emergency department, the Supreme Court of North Dakota held:

> Relying on *Lewisburg Community Hosp. v. Alfredson*, 805 S.W.2d 756 (Tenn. 1991), the plaintiffs argue the defendants breached the medical staff bylaws by not adhering to the due process and hearing provisions. In *Alfredson*, 805 S.W.2d at 761, the court held a hospital's termination of a radiologist's exclusive contract and denial of access to hospital equipment and staff "significantly reduced" the radiologist's privileges. The court held the hospital breached its contract by failing to provide the radiologist a hearing under the medical staff bylaws. *Id.*
>
> The majority of courts, however, have rejected the rational of *Alfredson* and have held hearing and due process provisions in similar medical staff bylaws are not implicated unless there are allegations against a physician bearing on professional competency and conduct. We agree with the majority of courts, and we hold the hearing and due process provisions of the Hospital's medical staff bylaws are not implicated unless there are allegations bearing on professional competency, conduct, or character.
>
> Here, the plaintiffs' medical privileges were not revoked or suspended, and there were no allegations bearing on professional competency, conduct, or character. Rather, the plaintiffs were not assigned staff coverage in the Hospital's emergency department. The right to exercise medical privileges is separate from the granting or revoking of those privileges, and a physician with privileges is not guaranteed employment or the free and unfettered right to use a facility to exercise those privileges. We conclude, as a matter of law, the hearing and due process provisions of the Hospital's medical staff bylaws were not implicated in this case.

*Van Valkenburg*, 606 N.W.2d at 917-18 (citations omitted).

Addressing the contractual and due process rights of a radiologist excluded by exclusive contract closure of a hospital radiology department, the Supreme Court of Kansas held:

> We believe the bylaws, when considered as a whole, support the conclusion of the Court of Appeals that Dutta was not entitled to a hearing because the hospital's managerial decision was based on business considerations. The Court of Appeals distinguished a case relied on by Dutta, *Lewisburg Community Hosp. v. Alfredson*, 805 S.W.2d 756 (Tenn. 1991), on the basis that St. Francis' bylaws limit a physician's right to a hearing to those matters bearing on professional competency and conduct. 18 Kan.App.2d at 253. We agree. The threshold issue in *Lewisburg* was whether the bylaws formed a contract with the plaintiff radiologist as a member of the medical staff. 805 S.W.2d at 759. St. Francis, in the case at bar, has admitted the contractual relationship. We find no reference in *Lewisburg* to a bylaws provision limiting hearings to matters of professional competency. The hospital

-10-

bylaws in *Lewisburg* were construed to require the hospital to permit the use of certain facilities by physicians granted clinical privileges in a particular specialty. 805 S.W.2d at 761. No such requirement appears in the St. Francis bylaws. The weight of authority supports the conclusion of the Court of Appeals. *Lewisburg* appears to be the only contrary authority. We are unpersuaded by the reasoning in *Lewisburg*. A parallel medical employment issue was recently reviewed in *Bartley v. Eastern Maine Medical Center*, 617 A.2d 1020 (Me. 1992). *Bartley* held that because the staff privileges of the plaintiff emergency department physicians had not been revoked or reduced, the physicians were not entitled to notice and hearing under the hospital bylaws. The physicians in *Bartley* were notified that they could no longer work in the emergency room unless they negotiated new employment contracts with the hospital. The physicians' staff privileges were not terminated when the hospital made different arrangements for staffing the emergency department. The *Bartley* court noted that there is a distinction between a grant of privileges and the right to exercise privileges. *Bartley* found that the hospital bylaws did not apply to the emergency room physicians' terminations because there had been no allegation of unprofessional conduct or privilege reduction. 617 A.2d at 1021. See *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 481 (7th Cir.), *cert. denied* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); *Engelstad v. Virginia Mun. Hosp.*, 718 F.2d 262, 268 (8th Cir. 1983); *Lewin v. St. Joseph Hospital of Orange*, 82 Cal.App.3d 368, 391, 146 Cal.Rptr. 892 (1978); *Anne Arundel Gen. Hosp. v. O'Brien*, 49 Md.App. 362, 371-73, 432 A.2d 483 (1981); *Holt v. Good Samaritan Hosp. & Health Ctr.*, 69 Ohio App.3d 439, 445-46, 590 N.E.2d 1318 (1990); and *Adler v. Montefiore Hosp. of W.Pa.*, 453 Pa. 60, 80-81, 311 A.2d 634 (1973), *cert. denied* 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974).

*Dutta*, 867 P.2d at 1062-63.

As an intermediate appellate court, we are bound by *Alfredson*, and unless the case has been legislatively overruled by Chapter 778 of the Public Acts of 1996 (sections 7-57-601 to 604 of the Code), we are bound to follow it. Thus, this case would have to be reversed and remanded as Appellees must grant a hearing to the Appellants pursuant to the medical staff bylaws.

However, *Alfredson* was decided by the Tennessee Supreme Court on March 4, 1991. Chapter 119 of the Public Acts of 1995 (codified as Tennessee Code Annotated sections 7-57-501 to 504) was effective April 19, 1995, and chapter 778 of the Public Acts of 1996 (codified as Tennessee Code Annotated sections 7-57-601 to 604) was effective April 17, 1996. The contract between CRMC and Dr. Mead was renewed for a two year term in February of 1998. The contracts between CRMC and Drs. Humphrey, Limbacher and Coonce were renewed in 1999 for a period of two years. Thus, both Tennessee Code Annotated sections 7-57-501 to 504 and Tennessee Code Annotated sections 7-57-601 to 604 post-dated the *Alfredson* decision and pre-dated each of the four contracts in issue in this case. As the contracts in issue post-date the legislative enactments involved,

there can be no impairment of the obligation of contract. *Munday v. Wisconsin Trust Co.*, 252 U.S. 499 (1920).

Certain settled rules must be considered in determining the effect of legislative acts intervening between the decision in *Alfredson* and the contracts between CRMC and the Appellants.

1.      The General Assembly is presumed to know the existing state of the law on the subject under consideration when it enacts legislation. *Holder v. Tennessee Judicial Selection Comm'n*, 937 S.W.2d 877 (Tenn. 1996); *SunTrust Bank of Nashville v. Johnson*, 46 S.W.3d 216 (Tenn. Ct. App. 2000).

2.      A statute is to be construed with reference to pre-existing law and does not change such law further than it expressly declares or necessarily implies. *In re: Deskins' Estates*, 381 S.W.2d 921 (Tenn. 1964); *Winter v. Smith*, 914 S.W.2d 527 (Tenn. Ct. App. 1995).

3.      The court should consider the existing state of the law, the circumstances contemporaneous to the enactment of a new law, the facts which induced the new law, and the evils sought to be remedied. *First National Bank v. Howard*, 253 S.W.2d 961 (Tenn. 1923); *Still v. First Tenn. Bank, N.A.*, 900 S.W.2d 282 (Tenn. 1995); *Wachovia Bank of N. C. v. Johnson*, 26 S.W.3d 621 (Tenn. Ct. App. 2000).

4.      When the court can gather the paramount intention of the legislative action, such intention must be given effect although there may exist some apparent obstacles. *Rawlins v. Braswell*, 231 S.W.2d 1021 (Tenn. 1950); *Still*, 900 S.W.2d 282.

Applying such rules we must now determine the legislative intent in the enactment of sections 7-57-501 to 504 and sections 7-57-601 to 604 of the Code.

It is sections 7-57-601 to 604, entitled "Private Act Hospital Authority of 1996," that governs the issues in this case, but we are legislatively commanded by Tennessee Code Annotated section 7-57-603 (1998) that "[a] private act hospital authority, as defined in this part, in addition to the rights and powers granted to such authority by any private act of the general assembly or its charter of incorporation, has as supplemental and additional rights and powers, all powers granted to private act metropolitan hospital authorities in title 7, chapter 57, part 5." Turning then to Title 7, Chapter 57, part 5 of Tennessee Code Annotated, the declared intent of the legislature is expressed in section 7-57-501.

> The general assembly hereby finds that the demand for hospital, medical and health care services is rapidly changing as is the way and manner in which such services are purchased and delivered; that the market for hospital and health care services is becoming increasingly competitive; and that the hospital and other health care providers need flexibility to be able to respond to changing conditions by having the power to develop efficient and cost-effective methods to provide for hospital,

medical and health care needs. The general assembly also finds that the increasing competition and changing conditions force hospitals and other health care providers to develop market strategies and strategic plans to effectively compete. The general assembly further finds that public hospitals in metropolitan areas are presently at a competitive disadvantage, and that significant investments in the public assets of private act metropolitan hospital authorities could be jeopardized by inability to compete with private hospitals because of legal constraints upon the scope of their operations and limitations upon the power granted to public hospitals under existing law.

Tenn. Code Ann. §7-57-501(b)(1998).

In furtherance of the general purposes set forth in section 7-57-501(b) of the Code, the General Assembly granted specific powers that are set forth in section 7-57-502 and concluded such designation of specific powers with a declaration of legislative intent that is too clear to leave substantial doubt.

(c) In the exercise of its powers, including, without limitation, the powers in this section, any other provision of this part and of any other law a private act metropolitan hospital authority may acquire, manage, lease, purchase, sell, contract for or otherwise participate solely or with others in the ownership or operation of hospital, medical or health program properties and facilities and properties, facilities, and programs supporting or relating thereto of any kind and nature whatsoever and in any form of ownership whenever the board of trustees in its discretion shall determine it is consistent with the purposes and policies of this part or any private act applicable to it, and may exercise such powers regardless of the competitive consequences thereof.

Tenn. Code Ann. § 7-57-502(c) (1998) (emphasis added). Among the "competitive consequences" necessarily envisioned by such enactment are the significant reductions in clinical privileges of competing staff physicians displaced by an administrative business decision to "close" a department of a hospital by means of an exclusive contract.

There being no impairment in the obligation of existing contracts in this case, it would appear that CRMC acted within the scope of its powers under Tennessee Code Annotated sections 7-57-601 to 604 when it made the business decision to "close" its radiology department by exclusive contract. The "competitive consequences" to staff radiologists not employed by the exclusive provider are legislatively mandated.

CONCLUSION

*Lewisburg Community Hospital v. Alfredson* is a pronouncement by the Supreme Court of Tennessee that this intermediate appellate court is mandated to follow in the absence of legislative

action so clear as to leave no room for doubt. Such, in our judgment, is the effect of Code sections 7-57-601 to 604. The judgment of the trial court is in all respects affirmed. However, the last word still rests with the Supreme Court of Tennessee.

The case is remanded to the trial court for such further proceedings as may be necessary and proper.

Costs of the cause are assessed against the Appellants.

_____
WILLIAM B. CAIN, JUDGE